**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE WACKENHUT CORPORATION,
4200 Wackenhut Drive
Palm Beach Gardens, FL  33410-4243

           Plaintiff

v.

SEIU LOCAL 1,
111 E. Wacker Drive, Suite 2500
Chicago, IL  60601

           Defendant

_____/

Case No. 07cv436 (RJL)

The Honorable Richard J. Leon
U.S. District Court Judge

**ORAL ARGUMENT REQUESTED**

**PLAINTIFF, THE WACKENHUT CORPORATION'S,
MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO
QUASH SUMMONS AND DISMISS COMPLAINT**

DENNIS M. DEVANEY (DC BAR NO. 237420)
Attorney for Wackenhut Corporation
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI  48304
(248) 540-2300
ddevaney@stroblpc.com

## TABLE OF CONTENTS

Table of Authorities ........................................................................... ii

I.     FACTUAL BACKGROUND ............................................................. 1

II.    ARGUMENT ................................................................................. 6

       A.     Standard of Review ............................................................. 6

              1.     FRCP12(b)(6) ........................................................... 6

              2.     FRCP12(b)(2) ........................................................... 8

              3.     Personal Jurisdiction Pursuant to DC Code
                     §423(a)(1) ................................................................. 8

              4.     Personal Jurisdiction Pursuant to DC Code
                     §13-334(a) .............................................................. 10

       B.     SEIU Local 1's Status As An Unincorporated Association
              Does Not Deprive This Court of Jurisdiction.......................... 11

       C.     Wackenhut Should Be Afforded The Opportunity For
              Jurisdictional Discovery of Mr. Balanoff................................ 12

       D.     Should The Court Conclude That It Lacks Personal
              Jurisdiction Over SEIU Local 1, The Interest Of Justice
              Would Be Served By A Transfer Of Jurisdiction Or
              Venue Pursuant To 28 U.S.C. §1406(A) .............................. 13

       E.     The Summons and Complaint Were Property
              Served on SEIU Local 1 ...................................................... 13

       F.     Each Count of the Complaint Is Properly Plead ................... 14

       G.     LCvR 7(m) .......................................................................... 17

III.   CONCLUSION ............................................................................ 18

Hearing Request .............................................................................. 19

Certificate of Service ....................................................................... 20

# TABLE OF AUTHORITIES

**Cases:**

*AMAF int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 850 (D.C. 1981) .......... 10

*Associated General Contractors v. NLRB*, 514 F.2d 433
(9th Cir.. 1975) at n. 12 ......................................................................... 17

*Atlantigas Corp. v. My Source, Inc.*, 290 F.Supp.2d 34, 37 (D.D.C. 2003) ....... 8

B*urger King Corporation v. Radzewicz*, 471 U.S. 462 (1985) ........................... 9

*Conley v. Gibson*, 355 US 41, 45-46 (1957) ..................................................... 6, 7

*Connell Construction Co., Inc. v. Plumbers and Steamfitters
Local Union No. 100*, 423 U.S. 884 (1975) ........................................... 14, 15, 16

*Cook v. Fox*, 537 F.2d 370, 371 (9th Cir. 1976) ................................................. 13

*Crane v. New York Zoological Society*, 894 F.2d 454,
456 (D.C. Cir. 1990) ............................................................................... 6

*Day v. Avery, et al, 179 U. S. App D.C. 63; 548 F 2d
1018 (D.C. Cir 1976)* .............................................................................. 11

*Duly v. United Technologies*, 786 F.Supp 65, 71 (D.D.C. 1992) ....................... 8

*El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 675-676 (D.C. Cir. 1996) ....... 9, 10

*Environmental Research Int'l, Inc. v. Lockwood Green Engineers, Inc.*,
355 A2d 808, 810-811 (D.D.C. 1976) (*en banc*). .................................. 8

*First Chicago Int'l v. United Exchange Co. Ltd.*,
836 F.2d 1375-1378 (D.C. Cir. 1988) ..................................................... 8, 9

*Goldlawn, Inc. v. Heiman*, 369 U.S. 463, 466, 82 S.Ct. 913, 915,
8 L.Ed.2d 39 (1962) ............................................................................... 13

*Gorman v. Ameritrade Holding Corp., 293 F. 3d 506 (D. C. Cir 2002)* .............. 10

*Hayes v. RCA Service Co.*, 546 F. Supp. 661, 665 (D.D.C. 1982) ................... 13

*Helicopteros Nacionales de Columbia, S.A. v. Hall*,
466 U.S. 408, 416 (1984) ....................................................................... 10

*Material Supply Int'l Inc. v. Sun Match Industries Co.*,
 62 F.Supp.2d at 13, 20 (D.D.C. 1999)...................................................9

*Metal Industry Company v. Superior Court*, 480 U.S. 102 (1987).....................9

*Riggs v. Home Builder's Institute*, 203 F.Supp.2d 1, 26 (D.D.C. 2002)............7

*Shapiro, Lifschitz & Schram, PC v. R.E. Hazard*, 90 F.Supp.2d 15, 22 ............9

*Teamsters v. Morton*, 377 U.S. 260 ...................................................16

*U.S. v. Philip Morris, Inc.*, 116 F. Supp.2d. 131, 135 (D.D.C. 2000) .................8

**Statutes:**

28 U.S.C. § 1331 ...........................................................................................14
28 U.S.C. § 1337 ...........................................................................................14
28 U.S.C. § 1406(a)........................................................................................13
29 U.S.C. §158(e)...........................................................................................5, 7, 8,
 ...............................................................................................13, 14,
 ...............................................................................................15, 16
29 U.S.C. §158(b)(4)......................................................................................4, 6, 7, 8,
 ................................................................................................ 14, 16,
 ................................................................................................ 17
29 U.S.C. § 187 .............................................................................................7, 11, 15,
 ................................................................................................16,
D.C. Code Ann. § 13-334..............................................................................10,
D.C. Code Ann. § 13-423(a) ..........................................................................8
PL 86-257    .................................................................................................17

**Rules:**

FRCP 4(h)    .................................................................................................14
FRCP 12 (b)(2) ............................................................................................8
FRCP 12(b)(6) .............................................................................................6
FRCP 15    .................................................................................................12
LCvR 7(m)    .................................................................................................17
15 Wright, Miller & Cooper, Federal Practice and
 Procedure §3827, at 170 (1976). ..........................................................13

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE WACKENHUT CORPORATION,
4200 Wackenhut Drive
Palm Beach Gardens, FL  33410-4243

                    Plaintiff

v.

SEIU LOCAL 1,
111 E. Wacker Drive, Suite 2500
Chicago, IL  60601

                    Defendant

_____/

Case No. 07cv436 (RJL)

The Honorable Richard J. Leon
U.S. District Court Judge

**ORAL ARGUMENT REQUESTED**

**PLAINTIFF, THE WACKENHUT CORPORATION'S,
MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO
QUASH SUMMONS AND DISMISS COMPLAINT**

### I.    FACTUAL BACKGROUND

In the Chicago area market, security and guard services have traditionally been procured by building owners and managers by subcontracting for such guard services. The Wackenhut Corporation ("Wackenhut") is one of the largest providers of security services in the United States.  In combination with its parent company, Group 4 Securicor, Plc, Wackenhut is part of the second largest provider of security services in the world.

In the Chicago market, prior to 2003, two agreements covered the provision of security services in the Chicago area.  These separate agreements were characterized as the "Downtown Agreement" and the "Suburban Agreement" and the scope of the bargaining units was defined by geographical boundaries.

In 2003, the SEIU and its Locals, including SEIU Local 1, began a campaign to organize the security guard industry across the country.  Like other national campaigns, such as Justice for Janitors, the SEIU and its Locals, including SEIU Local 1, chose not to pursue the traditional route to union certification established by Section 9 of the National Labor Relations Act.  Instead, the SEIU and its Locals, including SEIU Local 1, focused on top-down organizing efforts whereby pressure was brought to bear to organize on an industry-wide basis by convincing employers to agree to area contracts in major markets, so that employers would recognize the union on the basis of card check/neutrality agreements.[1]

In 1999, Wackenhut acceded to the Suburban Agreement (the "Suburban Agreement"). The Suburban Agreement was negotiated between SEIU Local 1 and a building owners and managers trade association (BOMA/Chicago), and covered a geographically defined bargaining unit on the west side of Chicago.  The various interested parties began negotiations for a successor to the Suburban Agreement in 2001.  The Agreement was initially set to expire on December 31, 2001, but prior to this point, the parties agreed to extend the Agreement until January 21, 2003, and thereafter, subject to a 72 hour notice of termination by any party.  In July 2002, Mona Ballenger, SEIU Local 1 Security Division Director, forwarded a copy of a complete successor contract proposal to Wackenhut's Vice President of Labor Relations.  That contract was supposedly modeled on the successor to the Suburban Agreement, which the SEIU had recently negotiated with BOMA/Chicago.  The proposed "master standard agreement" that SEIU Local 1 was seeking to have Wackenhut sign contained a clause

---

[1] As a result of Section 9(b)(3) of the National Labor Relations Act, voluntary recognition is the only legally permissible way for SEIU, a mixed union, to obtain bargaining rights to represent guards.

expanding the definition of the bargaining unit which, if Wackenhut had acquiesced, would have required automatic application of the Agreement to Wackenhut guarded facilities located outside the existing bargaining unit.

Specifically, the proposed contract would have expanded the unit to cover the entire State of Illinois, as well as certain parts of northwest Indiana.  On several occasions, Wackenhut objected to the inclusion of the expanded bargaining unit in the proposed contract.  In May of 2003, Wackenhut officials  met with Tom Balanoff, SEIU Local 1 President, and other union officials to negotiate a successor contract to the Suburban Agreement applicable to Wackenhut.  Balanoff indicated that SEIU Local 1 had already reached agreement with BOMA/Chicago on the expanded definition of the bargaining unit and said that the union would simply not negotiate anything different with Wackenhut.  The union informed Wackenhut that SEIU Local 1 was not willing to change its position on the issue.  Wackenhut, as is its right under the National Labor Relations Act, rejected SEIU Local 1's demand.  Following that meeting, SEIU Local 1 exercised the 72 hour termination notice provision and informed Wackenhut that SEIU Local 1 was terminating the Suburban Agreement as to Wackenhut on July 29, 2003.

In September, 2003, the SEIU sought to increase pressure on Wackenhut by approaching Wackenhut's parent corporation, Group 4 Securicor, Plc.  The efforts to enmesh Group 4 Securicor, Plc, in the dispute between Wackenhut and SEIU continues unabated, **Exhibit 1**.  A meeting attended by Wackenhut CEO, Gary Sanders; Executive Vice President, Drew Levine; and SEIU Local 1 President, Tom Balanoff, as well as SEIU International Official, Steven Lerner, was held in Miami.  At this meeting the union gave Wackenhut a list of 25 cities in which the union wanted Wackenhut to

3

voluntarily recognize SEIU through a voluntary card check and neutrality agreement. Wackenhut's senior management indicated to the SEIU that for Wackenhut to consider such an arrangement, Wackenhut would need the ability to exclude certain customers from application of the SEIU agreement, primarily for Wackenhut's national accounts. Tom Balanoff responded for the union and said "no way." Shortly after that meeting, the union escalated its corporate campaign against Wackenhut.

Among other things, the SEIU launched a website, www.eyeonwackenhut.com. This website continues to be utilized by the Union and SEIU Local 1 provides a direct link on its website (www.seiu1.org) to the www.eyeonwackenhut website, which is maintained, managed and operated in the District of Columbia. The avowed purpose of the corporate campaign against Wackenhut, including actions by its Locals, such as SEIU Local 1, was and is to put pressure on Wackenhut to enter into a nationwide card check/neutrality agreement. In addition to the link to www.eyeonwackenhut.com, SEIU Local 1 has recently added an additional link to Stand for Security, which is also operated and managed in the District of Columbia. These websites actively solicit support and action to pressure Wackenhut and other security service providers, **Exhibit 2**.

In September of 2005, Wackenhut filed an 8(b)(4) charge with Region 13 of the National Labor Relations Board against SEIU Local 1, other SEIU Locals, and the SEIU International. The union agreed to post the Notice attached hereto as **Exhibit 3**, and

the posting locations specifically included SEIU Local 1's office in Chicago, as well as the SEIU office in Washington, D.C.[2]

On October 4, 2006, Wackenhut filed a new charge with Region 13, via Federal Express, alleging that SEIU Local 1 had violated Section 8(e) of the National Labor Relations Act by entering into an agreement with BOMA/Chicago which included unlawful union security clauses. The charge was docketed on October 5, 2006 by Region 13. On January 30, 2007, the General Counsel of the NLRB informed Wackenhut that Complaint would issue on Wackenhut's 8(e) charge against SEIU Local 1 based on the charge and Wackenhut's supporting position statements, **Exhibit 4**.

The Downtown Security Agreement expired in April of 2004. The BOMA/Chicago SEIU Local 1 contract that was to cover downtown security officers was not adopted until June of 2004. The contract was made retroactive to April 26, 2004. Wackenhut did not agree to the expanded unit in the Suburban Agreement, nor to the unit scope of the revised Downtown Agreement. In March, 2005, Mona Ballenger, Security Director of SEIU Local 1, sent a letter to the Vice President of Labor Relations of Wackenhut, indicating that the Downtown Master Agreement would cover commercial office buildings within the area bounded by Roosevelt Road, Lake Michigan, North Avenue and Racine Avenue in Chicago. Ballenger's letter specifically stated that the BOMA/Chicago-SEIU Local 1 Security Collective Bargaining Agreement supersedes the contractor agreement in those buildings which have BOMA security signatory status, **Exhibit 5**.

---

[2] Region 13 of the National Labor Relations Board agreed to inclusion of a non-admissions clause as part of the posting requirement over the objection of The Wackenhut Corporation which was the charging party.

Although Wackenhut is one of the largest security services providers in the United States, its presence in the Chicago market covered by the Downtown Agreement currently extends to only six (6) clients, and one of those is a national account. Because of the impact of the BOMA/Chicago-SEIU Local 1 Downtown Security Agreement on Wackenhut's ability to compete in Chicago, Wackenhut reluctantly signed on to a CBA with SEIU covering the downtown jurisdiction in May of 2005.

On March 2, 2007, Wackenhut filed additional charges with Region 13, alleging that Defendant SEIU Local 1 had violated Section 8(b)(1)(a) and 8(b)(4) of the NLRA. In light of Wackenhut's decision to file the Section 303 action *sub judice*, Wackenhut subsequently voluntarily withdrew the 8(b)(1)(a) and 8(b)(4) charges filed with Region 13. The voluntary withdrawals were without prejudice to subsequent filings as long as such filings come within the NLRA's six month 10(b) statute of limitations provision.

## II.    ARGUMENT

### A.    Standard of Review

#### 1. FRCP 12(b)(6)

When considering a Motion to Dismiss for Failure to State a Claim, a court should not dismiss the Complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Riggs v. Home Builder's Institute*, 203 F.Supp.2d 1, 26 (D.D.C. 2002) (quoting *Conley v. Gibson*, 355 US 41, 45-46 (1957). Indeed, under the Federal Rules of Civil Procedure, a complaint "need not allege all that [plaintiff] must eventually prove." Id. In addition "[a]t a motion to dismiss stage 'the only relevant factual allegations are the plaintiffs and they

must be presumed to be true.'" *U.S. v. Philip Morris, Inc.*, 116 F. Supp.2d. 131, 135 (D.D.C. 2000).

Federal Rules of Civil Procedure have as one of their purposes to insure that Defendants are apprised of the theory of the Plaintiff's case. In its Motion to Dismiss, SEIU Local 1 asserts that Plaintiff's Complaint does not provide the basis for making a claim pursuant to Section 303. At the initial pleadings stage, the Federal Rules primarily require that the pleading give notice of the Plaintiff's theory. "The complaint need only set forth 'a short grounds upon which it rests.'" *Conley v. Gibson*, 355 U.S. 41, 47-48 (1957). Such simplified 'notice pleading' is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." Id. at 47-48. In light of these liberal pleading requirements, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 45-46.

As Defendant is well aware, prior to the 1959 LMRDA Amendments to the LMRA, Section 8(b)(4) specifically listed unfair labor practices which violated that portion of the Statute. In 1959, Congress included language in the Statute which directly addressed the interaction between Section 8(e) and the amended language of Section 8(b)(4).

As a general matter, cases raising 8(e) and 8(b)(4) claims for damages have been few and far between. Because the U.S. District Court for the District of Columbia and the D.C. Circuit Court review a large portion of cases arising with respect to the National Labor Relations Act, there is a substantial existing body of case precedent

construing Section 8(e) and 8(b)(4) which makes this Court a particularly appropriate forum for resolution of the issues alleged in Wackenhut's Complaint.

### 2.    FRCP 12(b)(2)

With respect to a motion to dismiss for lack of personal jurisdiction, precedent in this Court is clear that if a motion to dismiss raises factual issues respecting whether the Defendant is subject to jurisdiction, a court must construe any discrepancy raised by the Motion in favor of the non-moving party. *See Crane v. New York Zoological Society*, 894 F.2d 454, 456 (D.C. Cir. 1990). ("Factual discrepancies appearing in the record must be resolved in favor of the Plaintiff.")

### 3.    Personal Jurisdiction Pursuant to DC Code §423(a)(1)

It is well settled that personal jurisdiction over a non-resident defendant can be established in U.S. District Court for the District of Columbia in several ways. The District of Columbia "Long Arm" statute, D.C. Code Section 13-423 enumerates one basis for personal jurisdiction over non-residents. Section 423(a)(1) extends personal jurisdiction to persons "transacting any business in the District of Columbia". Section 423(b) states that "only a claim for relief arising from the acts enumerated in this Section may be asserted."[3]    To establish personal jurisdiction under this subsection, the Plaintiffs must demonstrate that (1) the Defendant transacted business in the District of Columbia; (2) the claim arose from the business transacted in the District; (3) the Defendant had minimum contacts with the District; and (4) the Courts exercise of personal jurisdiction would not offend "traditional notions of fair play and substantial justice." *Atlantigas Corp. v. My Source, Inc.*, 290 F.Supp.2d 34, 37 (D.D.C. 2003); *Duly*

---

[3] Section 13-423(a)(1) provides that "a District of Columbia Court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the persons transacting any business in the District of Columbia" DC Code Section 13-423(a)(1).

*v. United Technologies*, 786 F.Supp 65, 71 (D.D.C. 1992). As the Court in *Atlantigas* noted, this subsection of the Long Arm statute permits the exercise of personal jurisdiction to the full extent permitted by the due process clause of the Constitution, citing *First Chicago Int'l vs. United Exchange Co. Ltd.*, 836 F.2d 1375, 1377 (D.C. Cir. 1988); *Environmental Research Int'l, Inc. v. Lockwood Green Engineers, Inc.*, 355 A2d 808, 810-811 (D.D.C. 1976) (*en banc*). The constitutional touchstone of the due process determination is whether "the defendant purposely established minimum contacts in the forum state." *See, e.g., Metal Industry Company v. Superior Court*, 480 U.S. 102 (1987), or "purposely availed itself of the privilege of conducting business in the forum state" and whether the defendant's conduct in connection with that state is such that it should "reasonably anticipate being summoned into court there", *Burger King Corporation v. Radzewicz*, 471 U.S. 462 (1985).

The D.C. Long Arm Statute is to be interpreted broadly and factual disputes are to be resolved in favor of the plaintiff. *First Chicago Int'l v. United Exchange Co. Ltd.*, 836 F.2d at 1378. Ordinarily a defendant corporation's contact with a forum may not be attributed to affiliated corporations. *See El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 675-676 (D.C. Cir. 1996). An exception exists when the party contesting jurisdiction is found to be nothing more than the alter ego of an affiliated corporation over which the Court does have jurisdiction. In that case, the affiliated corporation's jurisdictional contacts may be extended to reach the other corporate entity. *See El-Fadl v. Central Bank of Jordan*, 75 F.3d at 668, 676 (D.C. Cir. 1996) and *Material Supply Int'l Inc. v. Sun Match Industries Co.*, 62 F.Supp.2d at 13, 20 (D.D.C. 1999) (same "where parent corporations so dominates as to negate separate personality"). Whether one entity is

the alter ego of another is a question of law to be decided by the Court. *See Shapiro, Lifschitz & Schram, PC v. R.E. Hazard*, 90 F.Supp.2d 15, 22 ("[u]ltimately the question is whether the parent corporation so dominates as to negate its (affiliate's) separate personality" making the exercise of jurisdiction over the foreign entity fair and equitable. *Material Supply Int'l Inc. v. Sun Match Industries Co.*, 62 f.Supp.2d at 13, 20 (D.D.C. 1999).

### 4.    Personal Jurisdiction Pursuant To DC Code §13-334(A)

Plaintiff has also asserted facts sufficient to establish jurisdiction over SEIU Local 1 pursuant to Section 13-334(a) of the DC Code.    Under the doctrine of *General Jurisdiction*, a Court may exercise personal jurisdiction over a non-resident defendant when that non-resident defendant has engaged in "continuous and systematic general business contacts in the forum notwithstanding the fact that those contacts do not relate to the underlying cause of action." *See Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 416 (1984), see also *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506; *El-Fadl v. Central Bank of Jordan*, 75 F.3d at 675.    Jurisdiction under Section 13-334(a) requires that such systematic contacts demonstrate a continuing presence in the forum directed at advancing the entity's (objectives).[4]    Although the provision facially concerns service of process, it has been construed to provide a general jurisdictional grant under certain circumstances. *See Gorman*, Id at 510, n.1; *AMAF int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 850 (D.C. 1981).

---

[4] Section 13-334(a) provides "in an action against a foreign corporation doing business in the District process may serve on the agent of the corporation or person conducting its business or when he is absent and cannot be found, by leaving a copy at the principal place of business in the district or where there is no such place of business, by leaving a copy at the place of business resident agent and district and that service is effectual to bring the corporation before the Court.

**B.    SEIU LOCAL 1'S STATUS AS AN UNINCORPORATED ASSOCIATION DOES NOT DEPRIVE THIS COURT OF JURISDICTION**

Finally, Local 1's reliance on *Gorman v. Ameritrade Holding Corp., 293 F. 3d 506 (D. C. Cir 2002)* to equate Local 1 with a "foreign corporation . . . doing business" with offices, employees and agents in the District of Columbia at pages 6-7 of its Memorandum in Support of its Motion to Dismiss misses the mark. At no time did Wackenhut ever suggest Local 1 is a corporation conducting commercial business in the District. Rather, Wackenhut has only alleged ***Local 1's union activities*** as an unincorporated association in the District of Columbia as a basis for jurisdiction for purposes of exercising "substantive rights" on behalf of itself and its union members which are subject to federal law, i.e., §303 of the Labor Management Relations Act.

Ignored by Local 1 in its Memorandum is the leading case of *Day v. Avery, et al, 179 U. S. App D.C. 63; 548 F 2d 1018 (D.C. Cir 1976)* where the D. C. Circuit stated:

> " . . . . capacity to sue or be sued (other than for corporations) shall be determined by the law of the state in which the district court is held, <u>except (1) that a</u> partnership or other <u>unincorporated association</u>, which has no such capacity by the law of such state, <u>may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States</u>, . . . ." (emphasis supplied). 548 F2d, at *1023, n. 10.

Affirming the District Court's finding that a breach of contract claim against a partnership did not state a "substantive right" under federal law in the District, the D. C. Circuit held an unincorporated association like Local 1 could be sued under the District of Columbia's "long arm" jurisdiction statute on federal causes of action:

> " . . . . <u>unincorporated associations might be sued on federal causes of action where the federal claims imply such a capacity to be sued</u>, *e.g.*, antitrust actions. While the term "substantive rights" has been interpreted to embrace every manner of claim for relief - whether constitutional, *e.g.*, <u>*Council No. 34, AFSCME v. Ogilvie*, 465 F.2d 221 (7th Cir. 1972)</u>; statutory, *e.g.*, <u>*Petrol Shipping Corp. v. Kingdom of Greece*, 2d Cir., 360</u>

F.2d 103, *cert. denied*, 385 U.S. 931, 87 S. Ct. 291, 17 L. Ed. 2d 213
(1966) (suit to compel arbitration under Federal Arbitration Act); *Price v.
UMW*, 336 F.2d 771 (6th Cir. 1964), *cert. denied*, 380 U.S. 913, 85 S. Ct.
899, 13 L. Ed. 2d 799 (1965) **(secondary boycott action under § 303 of
the Labor Management Relations Act)**; implied from a criminal statute,
*National Ass'n for Community Dev. v. Hodgson*, 356 F. Supp. 1399
(D.D.C. 1973); **or even developed as federal common law under § 301
of the LMRA**, *Jersey Farms Milk Service, Inc. v. Amalgamated Meat
Cutters*, 297 F. Supp. 1098 (M.D.Tenn. 1969) . . . . " (emphasis supplied).
*Id.*

Contrary to Local 1's counsel's argument, this court has, and can otherwise exercise

personal jurisdiction over Local 1's union activities in this district.

### C.    WACKENHUT SHOULD BE AFFORDED THE OPPORTUNITY FOR JURISDICTIONAL DISCOVERY OF MR. BALANOFF

With respect to Mr. Balanoff's Affidavit, Wackenhut should be allowed to test

several of the assertions made in his Affidavit through jurisdictional discovery.    In its

Motion to Dismiss, SEIU Local 1 and Mr. Balanoff concede that Mr. Balanoff transacts

business in Washington, D.C., although he characterizes his contacts as primarily in

furtherance of his duties as International Vice President of SEIU.    Notwithstanding this

characterization, a quick search of the Internet by counsel for Wackenhut using the

"Google" search engine, produced a number of hits which show that Mr. Balanoff was in

Washington, D.C. as President of SEIU Local 1 and transacting business in that

capacity.    See, e.g., **Exhibit 6.**    As this Court is fully aware, Wackenhut may amend its

Complaint as a matter of right pursuant to Federal Rule of Civil Procedure 15 prior to an

answer being filed by SEIU Local 1.    Counsel for Wackenhut proposed to SEIU Local

1's attorneys that Mr. Balanoff be available for a deposition to explore his contacts and

actions on behalf of SEIU Local 1 in the District of Columbia, particularly as they impact

on the corporate campaign against Wackenhut and unfair labor practice charges filed by

Wackenhut, including its 8(e) charge, upon which Region 13 has issued complaint which is set for trial on June 11, 2007.

**D.     SHOULD THE COURT CONCLUDE THAT IT LACKS PERSONAL JURISDICTION OVER SEIU LOCAL 1, THE INTEREST OF JUSTICE WOULD BE SERVED BY A TRANSFER OF JURISDICTION OR VENUE PURSUANT TO 28 U.S.C. §1406(A)**

Should the Court be inclined to grant Defendants' Motion prior to jurisdictional discovery with respect to Mr. Balanoff's contacts with the District of Columbia and the asserted coordination between SEIU Local 1 and SEIU International as regards the coercive activity directed at The Wackenhut Corporation, which the NLRB General Counsel has concluded violates Section 8(e) Wackenhut respectfully requests that, pursuant to 28 U.S.C. §1406(a)[5], the Court transfer this case to the appropriate Federal District Court in Chicago, where no argument can be credibly made that personal jurisdiction or venue do not properly lie.  A court may transfer a case to another district even though it lacks personal jurisdiction over the defendants. *See, Goldlawn, Inc. v. Heiman*, 369 U.S. 463, 466, 82 S.Ct. 913, 915, 8 L.Ed.2d 39 (1962).  The decision whether a transfer or a dismissal is in the interest of justice rests within the sound discretion of the District Court.  *See, e.g., Cook v. Fox*, 537 F.2d 370, 371 (9th Cir. 1976); *Hayes v. RCA Service Co.,* 546 F. Supp. 661, 665 (D.D.C. 1982).  *See generally* 15 Wright, Miller & Cooper, Federal Practice and Procedure §3827, at 170 (1976).

**E.     THE SUMMONS AND COMPLAINT WERE PROPERLY SERVED ON SEIU LOCAL 1**

SEIU Local 1 alleges that Wackenhut's Summons and Complaint was not properly served.  The basis for this allegation is SEIU Local 1's claim that sufficient facts

---

[5] 28 U.S.C. §1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."

are not present to establish that a proper person served the documents nor that the service complied with FRCP 4(h).  To the contrary, Wackenhut filed a Certificate of Service with this Court establishing that Aaron Willoughby personally served an agent of SEIU Local 1 who was authorized to accept service.

Nonetheless, to directly address SEIU Local 1's assertion, Mr. Willoughby has certified by sworn affidavit that he is not a party to this litigation, he is over 18 years of age, and he described the circumstances surrounding service of the Summons and Complaint, **Exhibit 7**.

### F.    EACH COUNT OF THE COMPLAINT IS PROPERLY PLED

The U.S. Supreme Court's Opinion in *Connell Construction Co., Inc. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616 (1975) is instructive as to Wackenhut's Complaint where in commenting on *Connell's* position, Justice Powell, for the majority, noted that Congress did not intend to permit a union to approach a stranger contractor and obtain a binding agreement not to deal with non-union subcontractors.

Justice Powell noted that on its face the statute suggests no such limitation, but recognized that the Supreme Court has held that Section 8(e) must be interpreted in light of the statutory setting and the circumstances surrounding its enactment.  As the majority opinion puts it, "Section 8(e) was part of a legislative program designed to plug technical loopholes in Section 8(b)(4)'s general prohibition of secondary activities.  In Section 8(e), Congress broadly prescribed using contractual agreements to achieve economic coercion prohibited by Section 8(b)(4)" *Connell* at 629.   Powell noted that it

was highly improbable that Congress intended to allow unions to bring economic pressure via neutrals on non-union subcontractors.

As the majority opinion underscores, "one of the major aims of the 1959 Act was to limit top down organizing campaigns, in which unions used economic weapons to force recognition from an employer regardless of the wishes of his employees." *Connell* at 632. The Court went on to state that "these careful limits on the economic pressure unions may use in aid of the organizational campaigns would be undermined seriously...if Section 8(e) were construed to allow unions to seek subcontracting agreements at large from any (employer) vulnerable to [coercion].   Absent a clear indication that Congress intended to leave such a glaring loophole in its restrictions on top down organizing, we are unwilling to read the construction industry proviso as broadly as Local 100 suggests." *Connell* at 633.

In the broader context, outside of the construction industry, the Court noted that there is no legislative history in the 1959 Congress suggesting that labor law remedies for 8(e) violations were intended to be exclusive.   Justice Stewart, in his dissenting opinion, argued that Section 303 provides the exclusive remedy for violations of 8(e). The majority concluded that the agreement in *Connell*, which was outside the context of the collective bargaining relationship and not restricted to a job site to qualify for the construction industry proviso, nonetheless obligated Connell to subcontract work only to firms that have a union contract and, thus, was not protected by the labor exemption to the anti-trust laws.

As Justice Stewart pointed out, the damages remedy under Federal labor law was initially proposed by Senator Taft and in the Conference Committee the provision

which became Section 303 of the LMRA, 29 U.S. Code, Section 187, was adopted. Justice Stewart noted that those practices which were outlawed by the Statute as unlawful secondary activity by labor unions, were to be remedied only by seeking relief from the Board or by pursuing the newly created federal damages remedy provided by Section 303. As Stewart also pointed out, as part of the 1959 Amendments designed to close technical loopholes perceived in the Taft-Hartley Act, Congress amended Section 8(b)(4) to make it an unfair labor practice for a labor organization to threaten or coerce a neutral employer either directly or through his employees where an object of the secondary pressure is to force the employer to enter into an agreement prohibited by Section 8(e). That is the direct allegation included in Counts I and II of Wackenhut's Complaint.

The essence of *Connell's* Complaint parallels that made by Wackenhut, i.e., that Wackenhut was coerced by SEIU Local 1 into signing an agreement and was made subject to the unlawful BOMA/Chicago-SEIU Local 1 Security Agreement which induced neutral building owners in Chicago not to subcontract security guard services to security subcontractors, such as Wackenhut, which were not signatories to an agreement with SEIU. As Stewart pointed out, coercion under Section 8(b)(4) to force an employer to enter into an 8(e) agreement is prohibited by the Statute and compensatory damages (limited to actual) (see *Teamsters v. Morton*, 377 U.S. 252, 260 (1964), are recoverable under Section 303, including any provable damages caused by Wackenhut's inability to obtain subcontracting work from BOMA/Chicago members.

Contrary to SEIU Local 1's assertion in its Motion to Dismiss, Section 303 broadly grants a damages action to "whoever shall be injured in his business or property

by reason of a labor organization's engaging in an 8(b)(4) unfair labor practice." It is important to note that a number of Courts have held that Congress did not intend the term to coerce to deal only with pickets but that its reach goes to any form of economic pressure of a compelling or restraining nature. *See Associated General Contractors v. NLRB*, 514 F.2d 433 (9th Cir. 1975) at n. 12. [6]

> "We believe that when congress used "coerce" in Section 8(b)(4)(B) it did not intend to proscribe only strikes or picketing, but intended to reach any form of economic pressure of a compelling or restraining nature. *ACCO Construction Equipment, Inc. v. NLRB,* 511 F.2d 848, 852 (9th Cir. 1975); *NLRB v. International Brotherhood of Electrical Workers, AFL-CIO,* 405 F.2d 159, 162 (8th Cir. 1968), enforcing *Ets-Hokin Corporation,* 154 NLRB 839, cert. denied, 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed.2d 237 (1969); *Local Union No. 48 of Sheet Metal Workers International Association v. The Hardy Corporation,* 332 F.2d 682, 686 (5th Cir. 1964)."

### G.    LCvR 7(m)

In accordance with Local Rule 7(m), Plaintiff states that on April 16, 2007, Wackenhut, by its counsel, Dennis M. Devaney, conferred with Plaintiff's counsel, Kathy L. Krieger, who reserved SEIU Local 1's position with respect to jurisdictional discovery by deposition of Mr. Balanoff until subsequent to the filing of Plaintiff's Opposition to Defendant's Motion to Quash Summons and Dismiss Complaint.

---

[6] Public Law 86-257 struck out provisions which specify particular practices that were unlawful and inserted references to practice defined in Section 158(b)(4) of this title which Section defines the unfair labor practices normally enumerated in this subsection.

### III.    CONCLUSION

Contrary to SEIU Local 1's suggestion, this Court possesses personal jurisdiction over SEIU Local 1 and Wackenhut's Complaint is properly pled.

Wackenhut respectfully requests that SEIU Local 1's Motion to Quash Subpoena and to Dismiss Complaint be denied and this Court direct that the case should proceed to the merits.    Alternatively, the Court, in its discretion, should order jurisdictional discovery with respect to Mr. Balanoff.

Respectfully submitted,

**STROBL & SHARP, P.C.**

**DENNIS M. DEVANEY (DC BAR No. 237420)**
Attorneys for Wackenhut Corporation
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI  48304
(248) 540-2300
_ddevaney@stroblpc.com_

Dated April 30, 2007

## HEARING REQUESTED

Plaintiff, The Wackenhut Corporation, through its counsel, Dennis M. Devaney of Strobl & Sharp, P.C., hereby respectfully requests a hearing on SEIU Local 1's Motion to Quash Subpoena and Dismiss Complaint.

Respectfully submitted,

**STROBL & SHARP, P.C.**

**DENNIS M. DEVANEY (DC BAR NO. 237420)**
Attorneys for Wackenhut Corporation
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI  48304
(248) 540-2300
*ddevaney@stroblpc.com*

Dated April 30, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of April, 2007, I served a copy of

1.   Plaintiff, The Wackenhut Corporation's, Memorandum Of Points And Authorities In Opposition To Defendant's Motion To Quash Summons And Dismiss Complaint, with Exhibits 1 through 7

2.   Proposed Order, and

3.   this Certificate of Service

upon Defendant's counsel by filing it electronically in accordance with the Court's CM/ECF guidelines.   Courtesy copies were served by electronic mail and first class mail upon:

Kathy L. Krieger, Esq.
James & Hoffman, P.C.
1101 17th Street, NW Suite 510
Washington, DC  20036
Email:  klkrieger@jamhoff.com

Alexia M. Kulwiec, Esq.
111 E. Wacker Drive, Suite 2500
Chicago, IL  60601
kulwieca@seiu1.org

Judy L. Holland
Legal Assistant to Dennis M. Devaney

# EXHIBIT 1

BARACK OBAMA
ILLINOIS

COMMITTEES:
ENVIRONMENT AND
PUBLIC WORKS
FOREIGN RELATIONS
VETERANS' AFFAIRS

# United States Senate

WASHINGTON, DC 20510

April 3, 2007

Mr. Nick Buckles
Group Chief Executive
Securior, Plc
Sutton Park House
15, Carshalton Road
Sutton, Surrey SMI 4LD
ENGLAND

Dear Mr. Buckles:

I am writing regarding the labor and management practices of your American subsidiary, the Wackenhut Corporation. Wackenhut employs 35,000 people in the United States in a number of services, including security officers at multiple private and public facilities. I am concerned about the Corporation's treatment of workers who are either organized or wish to organize. To help resolve concerns related to your subsidiary's behavior, I strongly urge you to accept the Wackenhut Corporation security officers' desire to organize using a card check process.

I believe that accepting the card check process and working with your employees in a collaborative fashion would yield improved performance and restore public confidence in your services. There are a number of industry leaders in the United States that have had good experiences with the card check process, including Cingular Wireless, Kaiser Permanente, and the casinos in Las Vegas which as a group have accepted the Culinary Union's card check organized bargaining unit.

Moreover, as the U.S. government's largest security provider, Wackenhut has a special obligation to uphold the highest values and fully respect its workers. Taxpayer money should not be used to deny workers their right to organize or to fight legitimate complaints against violations of collectively bargained agreements.

As an example of the behavior that led to this letter, in Illinois, Local 1 of the Service Employees International Union (SEIU) has reported having multiple issues dealing with Wackenhut. In March 2006, a U.S. District Court judge ordered Wackenhut to comply with a Joint Arbitration Board's decision to uphold an SEIU grievance that the company was not complying with a collective bargaining agreement to pay area standard wages and benefits to its officers at AT&T buildings. I also understand that there is a separate case in Illinois where Wackenhut refused to abide by another arbitrator's decision to reinstate a worker that was wrongly fired.

WASHINGTON OFFICE
713 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
OFFICE (202) 224-2854
FAX (202) 228-4260

CHICAGO OFFICE
230 S. DEARBORN
SUITE 3900
CHICAGO IL 60604
OFFICE (312) 886-3506
FAX (312) 226-3514

SPRINGFIELD OFFICE
607 EAST ADAM
SUITE 1520
SPRINGFIELD, IL 62701
OFFICE (217) 492-5890
FAX (217) 492-5099

MARION OFFICE
701 NORTH COURT STREET
MARION, IL 62959
OFFICE (618) 997-2402
FAX (618) 997-2850

In addition to raising the standard of living for Wackenhut's employees, improved employee participation in Wackenhut's management decisions and improved labor-management relations at the company would have the secondary effect of producing better security at some of our most important government facilities. Because of the size of Wackenhut's contracts and its employee base, collectively bargained wages and benefits would also help raise pay and benefits in the industry as a whole.

I appreciate your consideration and look forward to working with you and the Service Employees International Union on reaching an agreement that will allow your workers to exercise their right to organize using a card check process.

Sincerely,

Barack Obama
United States Senator

# EXHIBIT 2



# SEIU LOCAL 1

*36,000 Members Strong Throughout Illinois and Southeast Wisconsin*

ON THE JOB
BENEFITS
OUR LOCAL
ACTION CENTER
AROUND SEIU
JOIN SEIU
EVENTS CALENDAR

>> SIGN UP TO RECEIVE **EMAIL UPDATES**

>> **CONTACT US**

>> FIND OUT ABOUT **SEIU JOBS**

>> VISIT OUR **STATE COUNCIL**

>> **SEIU STORE**



## Security Officers and Community Leade
## Rally for Worker Rights at Walgreens
*On annivesary of the assassination of Dr. Martin Luther King*
*rally commemorates the civil rights leaders' fight for economic*



On April 4, Alderman Toni Preckwinkle joi
security officers and other community sup
protest the elimination of job, wage and re
security by Walgreens' security contracto

A&R Security eliminated its workers guara
raises, pensions and job security when it
its union contract with the workers. The 8
were members of SEIU Local 1.

The event was part of a national day of ac
security officers and their supporters on t
anniversary of the assassination of Dr. Ma
King, Jr. The events commemorated the
leader's commitment to social and econo
for all working people.

Click here for
a leaflet about Walgreens' contractor A&R Security



\* Note:
You will need Adobe Acrobat Reader to open and read these
documents.

Get Adobe
Reader

Governor Rod Blagojevich has some great affordable health care programs for children
seniors and persons with disabilities. (click each image to get more information)





**I-SAVE®**
Safe and Affordable
Prescription Drugs

## Janitors win $22.4 million from supermarkets



Read how the janitors won big by standing up for their rights and working with SEIU.

## Securing good jobs for security workers



Wackenhut is a major security employer in the Chicago area and throughout the U.S. Yet while their Security Officers are union in Europe, Wackenhut and its parent company Group 4 Falck refuses to allow Security officers in the U.S. to organize to improve their wages and benefits.
To find out more...

## Know Your Rights

If you are ever called into an interv meeting with your supervisor or m they can investigate a situation wh result in discipline, you have spec representational rights.

☑ English ☑ Polish ☑ Spanish ☑ |

## Preventing and Survivi Layoffs

Receiving a lay-off notice is a deva scenario that we all want to avoid. SEIU Local 1 members are working lay-offs and win the funding that o and local communities need to pro quality public services.
Click here to find out what you can do.



Fulfill your goals with Scholarshi

Click here more

## Links to other websites



Watch the Flash Movie
Broadband | Dial-up
(Requires MacroMedia Flash)

"What SEIU members and allies have done will forever change the face of political organizing."
Andy Stern, SEIU President



# SEIU LOCAL 1

### 36,000 Members Strong Throughout Illinois and Southeast Wisconsin

home | our local

### SEIU Local 1 Officers

| President |
|:---:|
| Tom Balanoff |

| Secretary-Treasurer | Vice-President |
|:---:|:---:|
| Chris Andersen | Vince Pesha |
| Vice-President | Vice-President |
| Maria Graciela Barrera | Roderick Bashir |
| Vice-President | Vice-President |
| Airrine Castle | Nancy Cross |
| Vice-President | Vice-President |
| Dan Iverson | Kazimierz Lupa |
| | Recording Secretary |
| | Patricia Arroyo |

**ON THE JOB**
**BENEFITS**
**OUR LOCAL**
**ACTION CENTER**
**AROUND SEIU**
**JOIN SEIU**
**EVENTS CALENDAR**

>> SIGN UP TO RECEIVE EMAIL UPDATES
>> CONTACT US
>> FIND OUT ABOUT SEIU JOBS
>> VISIT OUR STATE COUNCIL
>> SEIU STORE



### Executive Board Members

| | |
|:---:|:---:|
| Paula Aguilar | Laura Garza |
| Downtown Commercial Janitors | SEIU Local 1 Staff |
| Mona Ballenger | Neil Kijek |
| SEIU Local 1 Staff | Cemetary Workers |
| Jose Bernal | Delois Johnson |
| Suburban Commercial Janitors | Downtown Commercial Janitors |
| Bryant Boyd | Stanley Lipinski |
| Downtown Security Officers | Suburban Commercial Janitors |

| | |
|---|---|
| **Charles Bridgemon**<br><br>SEIU Local 1 Staff | **Millard McCoy**<br><br>Stadium Vendors |
| **Joe Cacic**<br><br>High-Rise Residential Janitors | **Leroy Okrasinski**<br><br>Walk-Up Residential Janitors |
| **Kenneth Cliff**<br><br>SEIU Local 1 Staff | **Jimmy Pitts**<br><br>Walk-up Residential Janitor |
| **Zofia Czupek**<br><br>Downtown Commercial Janitors | **William Rivera**<br><br>High-Rise Residential Workers |
| **Denise Dawson**<br><br>Downtown Security Officers | **Carl Rocconi**<br><br>SEIU Local 1 Staff |
| **Walter Drechsler**<br><br>Walk-up Residential Janitors | **Mike Rubin**<br><br>Theater Vendor |
| **Alexandra Figus**<br><br>Downtown Commercial Janitors | **Mahira Selimbegovic**<br><br>SEIU Local 1 Staff |
| **Robert Fultz**<br><br>Marshall Fields Warehouse | **Dan Schlademan**<br><br>SEIU Local 1 Staff |
| | **Miguel Vigo**<br><br>Residential High-Rise Janitors |

Email this Page    Print this P





# SEIU LOCAL 1

### 36,000 Members Strong Throughout Illinois and Southeast Wisconsin

home | our local

## SEIU Local 1 Staff:

| | | |
|---|---|---|
| Andersen, Chris | Chief of Staff | All |
| Arroyo, Patricia | Field Rep | Security |
| Baker, Jim | Researcher | All |
| Balanoff, Tom | President | All |
| Ball, Doug | Union Representative | Cemeteries |
| Ballenger, Mona | Director - Security | Security |
| Bashir, Rod | Director - Aviation | Allied/Industrial |
| Bass, Jeffrey | Field Rep | Residential |
| Battaglia, Laila | Grievance Center Rep | Building Service |
| Ben-Isvy, Jonathan | Lead Field Rep | Building Service |
| Benton, Maqueena | Field Rep | Security |
| Bicchieri, Leone | Lead Organizer | Wisconsin |
| Bowen, Ed | Lead Grievance Center Rep | Building Service |
| Brassfield, Denise | Call Center Rep | Call Center |
| Bridgemon, Charles | Director - Allied/Ind | Allied/Industrial |
| Brown, Clark | Union Rep/Organizer | Missouri |
| Bucio, Juan | Field Rep | Suburban Janitors |
| Carroll, Sherwin | City Director - Kansas City | Missouri |
| Castro, Maria | Secretary | All |
| Chavez, Veronica | Call Center Rep | Call Center |
| Clark, Linda | Legal Assistant | All |
| Cliff, Ken | Director - Contract Admin | All |
| Cook, Deother | Field Rep | Institutional |
| Corral, Maritza | Grievance Rep | All |
| Cross, Nancy | Assistant to President | All |
| Darga, Eva | Grievance Center Rep | Building Service |
| Droghn, Kim | Field Rep | Security |
| Elias, Efrian | Field Rep | Residential |
| Fabela, Arnoldo | Field Rep | Commercial |
| Frame, Michael | Political Director - Missouri | Missouri |
| Garza, Laura | Director - Institutional | Institutional Janitors |
| Gould-Walker, Lisa | Union Rep/Organizer | Missouri |
| Gunka, Margaret | Call Cener Rep | Call Center |
| Hade, Erica | Communications Director | All |
| Hayes, Jamesella | Union Rep/Organizer | Missouri |

### Navigation

ON THE JOB
BENEFITS
OUR LOCAL
ACTION CENTER
AROUND SEIU
JOIN SEIU
EVENTS CALENDAR

>> SIGN UP TO RECEIVE EMAIL UPDATES
>> CONTACT US
>> FIND OUT ABOUT SEIU JOBS
>> VISIT OUR STATE COUNCIL
>> SEIU STORE



| Hubbard, Roseann | Administrative Assistant to President | All |
| Holderbaum, Toni | Field Rep | Institutional |
| Ingram, Jackie | Secretary | Sports & Entertainment |
| Jones, Charles | Union Representative | Allied/Industrial |
| Kawalec, Roman | Field Rep | Suburban Janitors |
| Klipowicz, Karen | Researcher | All |
| Kozinski, Dariusz | Field Rep | Downtown Janitors |
| LaPapa, Mike | Union Representative | Sports & Entertainment |
| Mackay, Lydia | Field Rep | Commercial |
| Martino, Dino | Political Director | All |
| Munz, Ken | Assistant to President | All |
| Murdock, Annie | Secretary | Commercial |
| Murphy, Mike | Union Rep/Organizer | Missouri |
| Oliver, Kevin | Union Rep/Organizer | Missouri |
| Ortiz, Beverly | Organizer | All |
| Owsiany, Rich | Grievance Coordinator | All Commerical |
| Pawlaszek, Robert | Grievance Center Rep | Building Service |
| Perez, Maria | Receptionist | All |
| Pesha, Vince | Director - Sports & Ent | Sports & Entertainment |
| Pina, Maria | Call Center Rep | Call Center |
| Ploeser, James | Organizer | Madison |
| Polouski, Susan | Deputy Director | Commercial |
| Robinson, Marsha | Union Representative | Allied/Industrial |
| Rocconi, Carl | Director - Residental | Residential |
| Rodriquez, Netza | Organizer | All |
| Rozwadowski, Krystyna | Call Center Coordinator | Call Center |
| Saffold, Lonnell | Grievance Center Rep | Building Service |
| Salazar, Mary | Human Resources Director | All |
| Salcedo, Leticia | Organizing Director | All |
| Salmon, Emily | Grievance Center Rep | Building Service |
| Salto, Rosa | Grievance Center Rep | Building Service |
| Sandavol, Oscar | Field Rep | Institutional |
| Schlademan, Dan | Director - Commercial | All Commerical |
| Schneider, Marty | Field Rep | Residential |
| Selimbegovic, Mahira | Union Representative | Commercial |
| Shipley, Bill | Grievance Center Rep | Building Service |
| Sloan, Carrie | Researcher | All |
| Somerscales, David | Field Rep | Milwaukee |
| Toleto, Shaila | Organizer | Wisconsin |
| Townes, Terry | Field Rep | Security |
| Turner, Florence | Call Center Rep | Call Center |
| Velasquez, Roberto Jr. | Union Representative | Allied/Industrial |
| Villalobos, Carolina | Organizer | Commercial |
| Windsor, Ella | Union Rep/Organizer | Missouri |
| Zacarias, David | Organizer | All |

Zarris, John                    Field Rep                    Residential



Home | On The Job | Benefits | Our Local | Actio
Join SEIU | Events Calendar | Search | Contact
Copyright © SEIU Local 1 2007. All right

# EyeOnWackenhut

This site is hos
Service Employees Internatio
wholly independent of the Wackenhut Co

*Know the facts about Wackenhut*

Home

Justice Services

Defense Department

Homeland Security

Nuclear Facilities

Transportation Security

Whistleblowers

Media Center

For First-Time Visitors

What's New @ EOW

Documents Room

Links

Contact Us

Security has never been more important, so you need to know the facts about your security company. Make sure you're getting the security you pay for.

Search

_____  GO

⊙ Full Site
◯ This Section

Search Tips

Printer-friendly Version

## Featured Stories:

### UK's Biggest Security Firm G4S - Wackenhut's Parent Company - Caught Letting Killers, Rapists, Terror Suspects Go Unchecked

### G4S's Troubles Extend to US Juvenile Detention Centers with Alleged Sexual Misconduct, Inmate Uprisings, Abuse, Escapes

### EyeOnWackenhut Launches New Focus on G4S's Justice Services Operations

The United Kingdom's biggest security firm Group 4 Securicor (G4S) -- parent company of the US government's largest supplier of private guards, Wackenhut -- has been caught letting killers, rapists and terror suspects go unchecked, according to an investigation aired by the British Broadcasting System's news program *Inside Out*. The scandal extends beyond the UK and into US juvenile detention centers.

G4S-run facilities in the US have experienced multiple lost inmates from maximum security detention centers including one where the facility's rate is twice the U.S. national rate; sexual misconduct including multiple instances of G4S youth care workers engaging in sexual misconduct with inmates; inmate abuse linked to inadequate training and low pay.

EyeOnWackenhut will now begin posting information about G4S's operations in the field of Justice Services.

- Go to our new Justice Services webpage
- Read our press release on G4S's Justice Services problems in the UK and the US
- Watch the video from the BBC's *Inside Out* program
- Learn more about G4S's human rights problems around the world

### House Government Reform Committee Member Calls for Hearings on U.S. Government's Largest Security Contractor,

## $20 Mill
## Miami-E
## Taxpay
## *Fraud*
## *Investig*

TV Coverage (
DHS Insecuri



NBC Nightly News:
Insecurity? [Prece



Interview: AP Repo
Margasak [Preced

Wackenhut's I
Performance I



Wackenhut Se
at Nuclear Fac

Read our recent
"Homeland Inse
How Wackenhu
Compromising I
Security"

## Wackenhut, in Response to Charges of Racism, Discrimination and Poor Performance

### City Councilwoman Wendy Greuel also vows to examine Wackenhut's contracts with Los Angeles

A congressional hearing is needed to examine charges of racism, discrimination and poor performance against the federal government's largest security supplier, Wackenhut, said United States Representative and member of the House Committee on Government Reform Diane Watson (D-Calif.) during a meeting of the Los Angeles Commission on Wackenhut and Security Standards in Los Angeles Saturday.

Rep. Watson, joined by California state Sen. Mark Ridley-Thomas, Assemblyman Mervyn Dymally, Los Angeles Councilwoman Wendy Greuel, the Rev. Eric Lee of the Southern Christian Leadership Conference of Greater L.A., and Dr. Maulana Karenga of California State University–Long Beach, heard testimony from current and former employees of the nation's second largest security contractor about Wackenhut's business practices.

- Read the press release announcing Rep. Watson's call for hearings

---

## Security Officers Detail Alleged Racial Discrimination, Illegal Business Practices and Poor Performance by City of L.A.'s Largest Security Contractor

### Wackenhut Employees from the U.S. and Africa Testify Before Panel Led by Congresswoman Diane Watson and State Senator Ridley-Thomas

Current and former employees of Wackenhut, the city of Los Angeles' largest security contractor, testified before a commission of national and local leaders today about alleged racial and sexual discrimination, illegal retaliation against workers and poor performance by the security corporation. The second-largest private security company in the United States, Wackenhut has more than $5 million in contracts with the city of Los Angeles to protect buildings that include the Watts and Van Nuys city halls.

Three Wackenhut security officers from the U.S. Department of Energy's nuclear facility in Oak Ridge, Tennessee, addressed the commission regarding the hostile work environment, and "continuing systemic racial discrimination" they and other

**Wackenhut Whistleblower**

If you are awar fraud or fraudul claims made by Wackenhut t Federal Governi you may be elig receive a subst₂ monetary rewai

**New to our Sil**

Find Out what E all about...

African American officers have allegedly faced at that facility.

- Read the press release from the Los Angeles Commission on Wackenhut and Private Security Standards

---

## Homeland Security Committee Chair Bennie Thompson Calls for Increased Oversight and Review of Wackenhut Performance at Nuclear and Energy Sites in U.S.

In a recent letter to the Inspector General of the United States Department of Energy, Congressman Bennie G. Thompson (D-MS), Chairman of the Committee on Homeland Security of the United States House of Representatives, said he is "troubled by the Department's use of [Wackenhut] to provide security at our nation's critical nuclear and energy facilities."

Rep. Thompson cited reports of problems at Wackenhut-guarded facilities nationwide that lead to high employee turnover, low morale and ineffective security as "reason to question whether Wackenhut can provide quality security services."

The letter to DOE Inspector General Gregory Friedman comes in response to published media accounts and reports from Friedman's office exposing several problems at the Wackenhut-protected Oak Ridge Reservation, including cheating on a security drill, excessive overtime, cutbacks on training, and the falsification of training records.

- Click here to read the press release on Chairman Thompson's call for further inspections at Wackenhut-guarded sites.
- Read Thompson's letter to the Inspector General of the Department of Energy.

---

## Possible Security Risks Loom as Wackenhut Continues to Force Guards to Work Excessive Overtime at Exelon's Three Mile Island Nuclear Power Plant

Wackenhut management at Three Mile Island Nuclear Generating Station continues to work guards into excessive overtime despite negative effects this conduct may have on security of the facility. According to documents obtained by the Harrisburg (PA) *Patriot News*, some guards have been working 13 hour shifts up to six days a week for more than six straight

weeks. This revelation occurs nearly one year after the *Patriot-News* reported on a memo in which John Young, then head of Wackenhut security at TMI chastised security supervisors for failing to note that veteran officers were telling new hires safe places to sleep undetected while on duty.

The *Patriot News* now reports that in addition to excessive overtime issues, Wackenhut management has cancelled virtually all security training at the plant over the past six months.

- Read the entire February 6, 2007, Newhouse News Service article.
- Click here for more on this and other Wackenhut-related concerns at TMI.

---

## Alutiiq and Subcontractor Wackenhut Lose Major Army Base Security Work, Including Prestigious West Point

## Wackenhut as Subcontractor to Chenega Picks up Smaller Award in West

A shakeup in security contractors guarding U.S. Army installations has cost Alutiiq Security and Technology, an Alaska Native Corporation and its subcontractor, Wackenhut Services Inc. an estimated $23.6 million in revenue. According to the Army, in 2004 the value of Alutiiq's security contracts at these bases was $23.6 million, of which Wackenhut was eligible for up to 49%, or $11.6 million.

Chenega Security and Protection Services LLC, which is also an Alaska Native Corporation, recently won a contract in the same competition for the Western Region using Wackenhut Services, Inc. as a subcontractor. According to the Army, the contract is worth $15 million, for which Wackenhut is eligible for up to 49% or $7.4 million. The overall effect of the competition leaves Wackenhut short by approximately $4.2 million.

A second full and open competition for the remaining Army bases should be concluded in early 2007.

- Learn more about recent contract awards and about the Army's controversial outsourcing of security
- Read SEIU's press release
- Read the GAO report on contract security at U.S. Army bases
- Read SEIU's report on Army base security, Homeland *In*security

---

## New Allegations About Wackenhut Performance at Tennessee Army Ammunition Plant

In December, 2006 two former fire chiefs came forward to the Associated Press with allegations concerning lax firefighting practices at the Holston Army Ammunition Plant in Kingsport, Tennessee. Wackenhut Services, Inc., a wholly owned subsidiary of Wackenhut Corporation, has a contract to provide both security and firefighting services with BAE Systems, a British defense contractor which runs the facility on behalf of the Army.

Last September, a number of currently employed Wackenhut security officers at Holston came forward with allegations of lax security at the facility. Their statements prompted Senators Ron Wyden (D-OR) and Byron Dorgan (D-ND) to write to the Army's Inspector General requesting an investigation.

- Learn more about Wackenhut's performance at the Holston Army Ammunition plant.
- Read Sen. Wyden's and Dorgan's press statement.
- Read their letter to Lt. Gen. Stanley E. Green, Inspector General, United States Army

## Report Slams Security at Wackenhut-Guarded Oak Ridge Reservation

The Los Angeles Times reported on October 16th that the Department of Energy cannot meet its own post-Sept. 11 security standards to repel a terrorist force at the Y-12 nuclear weapons plant in Oak Ridge, Tennessee, which is the US repository of bomb-grade nuclear material. The plant is guarded by Wackenhut Services, Inc., a wholly owned subsidiary of the Wackenhut Corporation, which is in turn a subsidiary of the foreign-owned security conglomerate, Group 4 Securicor.

## South Texas Latest: Nuclear Regulatory Commission to Examine Security at Plant

The Houston Chronicle reports that the United States Nuclear Regulatory Commission will investigate security concerns at the South Texas Project nuclear plant after a report saying guards pointed out holes in the plant's security system.

## Security Faulted at Wackenhut-Guarded South Texas Project Nuclear Plant

The *Dallas Morning News* reported this week that whistleblowers at the Wackenhut-guarded South Texas Project nuclear power plant (STP) have reported instances of security guards failing to follow protocol, leaving the facility vulnerable to intruders, according to a study by the Union of Concerned Scientists (UCS).

The plant is managed by the STP Nuclear Operating Company, which is owned by Princeton, N.J.-based NRG Energy Inc., CPS Energy, an electric company owned by the City of San Antonio, and Austin Energy, a utility owned by the City of Austin.

Congressman Edward Markey (D-MA) formally asked the Chairman of the United States Nuclear Regulatory Commission to investigate the matter and report back with the agency's findings.

Last June STP was in the news after its owners announced plans to build two new nuclear power units as "part of a new wave of nuclear power plants in the U.S."

According to the *Dallas Morning News*, the UCS released a report Tuesday outlining instances when security guards didn't follow rules, such as failing to search an equipment truck and allowing it to park 40 yards from a container of spent fuel and allowing a convicted felon into the plant.

Wackenhut has provided guards at STP since 2001. In 2001, 2003, and 2005 Wackenhut received poor marks in company-sponsored reviews of the plant's "safety conscious work environment" .

The surveys have been periodically conducted by an independent survey research firm hired after the NRC found in 1998 that STP's owners had violated federal law by subjecting four employees to a "hostile work environment" after the employees raised safety concerns.

A spokesman for the plant's owners said the complaints seem to stem from friction during the last nine months between guards and Wackenhut management.

- Read the Union of Concerned Scientists' report on security problems at the South Texas Project and its accompanying press release.
- Read Congressman Markey's statement and letter to the NRC Chairman.
- Read more about Wackenhut's problems at the South Texas Project.

---

## Wackenhut Nuclear News Round-Up:

*At Pilgrim Nuclear Power Plant (Plymouth, MA):*

- **Wackenhut Loses Major Contract at Entergy Corporation's <u>Pilgrim Nuclear Power Plant</u>**
  - **Entergy Cites <u>Nuclear Industry Conflict of Interest</u> as Reason for Dropping Wackenhut at Pilgrim Plant**
  - **Entergy <u>Approached Pilgrim Guards' Union</u> To Take Work Back In-House**

*At Limerick Nuclear Power Plant (Sanatoga, PA):*

- **Wackenhut Guard <u>Caught Sleeping on Duty at Nuclear Power Plant</u>, Again**

*At Seabrook Station Nuclear Plant (Seabrook, NH):*

- **Wackenhut Security Failures at <u>Seabrook Station Nuclear Plant</u> Draw Possible Fine for Florida Power & Light**

---

The Wackenhut Corporation, the second largest private security company in the US, is a wholly owned subsidiary of the London-based <u>Group 4 Securicor</u>. Wackenhut claims that it provides "quality services at the highest professional standards."

EyeOnWackenhut.com pulls together information that will help you make an informed decision when you choose your security contractor.

- <u>Learn more</u> about this site

- <u>Read recent featured stories</u>

<u>2-23-2007 Press Release Thompson Letter to DOE IG.pdf</u> Press Release
<u>ThompsonDOE-IGLetter2Feb07.pdf</u> Thompson Letter Feb 2 2007

This site is hosted by the Service Employees International Union, wholly independent of Wackenhut

## EyeOnWackenhut

*This site is hos*
*Service Employees Internatio*
*wholly independent of the Wackenhut Co*

*Know the facts about Wackenhut*

Home

Justice Services

Defense Department

Homeland Security

Nuclear Facilities

Transportation Security

Whistleblowers

Media Center

For First-Time Visitors
  Management and Oversight
  Hiring and Screening
  Working Conditions
  Training

What's New @ EOW

Documents Room

Links

Contact Us

Security has never been more important, so you need to know the facts about your security company. Make sure you're getting the security you pay for.

Search

_____ GO

◉ Full Site
○ This Section

Search Tips



Printer-friendly Version

# New to the Site?

Here's why we're keeping such a watchful Eye on Wackenhut:

The Wackenhut Corporation, the second largest private security company in the US, claims that it provides "quality services at the highest professional standards."[1]

But a systematic analysis of public documents, press reports, and surveys of employees paints a different picture where "high road" rhetoric gives way to a "low-road" reality:

- Instead of "stringent employment requirements,"[2] research reveals hiring practices in which inappropriate people are placed in sensitive positions.
- Despite Wackenhut's claims that it provides "extensive training" to its guards, their security officers often receive limited training.
- The company's working conditions make it difficult for its employees to provide quality service. Many security officers work excessive overtime and Wackenhut has retaliated against - rather than encouraged -- employees who point out security lapses.
- These conditions form the background for documented security lapses, which raise questions about Wackenhut's management and oversight of its operations.

**EyeOnWackenhut.com gathers information to help you make an informed decision when choosing your security contractor.**

_____

[1] "Wackenhut: A Trusted Security Partner in Challenging Times, An overview of Security, Consulting and Investigation Services." Promotional compact disc, The Wackenhut Corporation, Palm Beach Gardens, FL.
[2] "Wackenhut Security and Related Services," The Wackenhut Corporation, Palm Beach Gardens, FL.



**Read the full adver** ran in *Roll Call.*

This site is hosted by the Service Employees International Union, wholly independent of Wackenhut

Home | Justice Services | Defense Department | Homeland Security | Nuclear Facilities | Transportation Security | Whistleblowers | Media Cente
Visitors | What's New @ EOW | Documents Room | Links | Contact Us

Printer-friendly Version

http://www.eyeonwackenhut.org/index.asp?Type=B_BASIC&SEC={9542B513-E458-4FB...   4/9/2007

# SEIU® *Stronger Together*

Search

En Español  Find a Local

*Service Employees International Union.® CTW, CLC*

1.8 Million members and g

**Property Services
Workers**

Stand for Security

About Us

About the Industry

Campaigns

I Am Security

Improving Security

State Security Report Card

Security Officers Uniting

In the News

Join Us

Justice for Janitors

**Property Services
FAQs**

What Is Property
Services?

What Is Justice for
Janitors?

What Is Stand for
Security?

Why Do We Need a
Property Services
Union?

Who Can Get Involved
and How Can I Join?

**Property Services
Resources**

About SEIU

Media Center

Political Action

Member Benefits and
Education

Community Center

Property Services    Stand for Security

# About the Industry

## January 2006

Some private security firms are taking the low road, undermining efforts by security officers, building owners, and responsible security firms to improve standards in private security. Get the facts about the security industry, standards and enforcement, security companies, and security unions.

## Security Numbers

- $34 billion a year is spent on private security services in America. This figure is expected to more than double by 2010.[i]
- There are approximately 1.1 million private security officers in the United States.[ii]  This is nearly double the number of American police officers.[iii]
- Private security is one of the top 10 fastest growing occupations in the U.S.  The industry is expected to add nearly 400,000 workers by the end of the decade[iv]
- A recent report on the private security services industry in the U.S. estimates that employee turnover can be as high as 600 percent annually within the guarding industry.[v]

## Standards and Enforcement

- Despite the size of the private security industry in the U.S., there are no federal laws or regulations governing the industry.
- State laws vary greatly with respect to standards and enforcement. Thirty-one states require *no* training for officers whatsoever. Alaska has the highest standards, requiring 48 hours total of pre- and post-hire training for each security officer and 8 hours of continuing education and training each year.
- In 21 states, private security workers do not have to be licensed and criminal background checks are not required in 16 states.
- In surveys conducted in California, Texas, and Florida, 70 percent of officers say their buildings never conduct bomb or natural disaster drills — and in June 2002, four in ten officers said their buildings hadn't implemented new procedures to strengthen security since 9/11.[vi]

## Security Companies

- According to the government, there are 12,000 private security firms operating in the U.S.[vii]  Nonetheless, the industry is dominated by a few large firms that include Securitas, Group 4 Securicor (Wackenhut), Guardsmark, Vance International Security Services and Initial Security.
- The largest private security firm in the U.S., and the world, is

**Property Services
Issues**

Living Wages

Security Officer Training

Job Turnover

SEIU SPOTLIGHT ON
**Affordable
Health Care**
Wealthy building owners have access to state-of-the-art health care while officers who guard their buildings can't afford doctors' visits.
More »

SIGN UP FOR
ACTION ALERTS
Receive e-mails about
important issues &
online actions.

PurpleOcean.org
Take a Stand
Make a Difference

Jobs
En español

Securitas, based in Sweden. Since 1998, Securitas has acquired Pinkerton, Burns and several other U.S. security firms and now employs 125,000 workers in the U.S. -- more than three times as many as any other security company.

- In 2002, Securitas reported nearly $7.5 billion in sales globally, including more than $3.2 billion from their U.S. security services operations.
- The second largest private security firm in the U.S. is Group 4 Securicor, a London-based company. In 2002, Group 4 purchased the U.S.-based Wackenhut Corporation and now employs approximately 40,000 security workers in the U.S.
- When Group 4 purchased Wackenhut, it reported $2.8 billion in annual revenues.

## Security Unions

- In Europe, security officers are able to work with management and public officials to set higher standards for training, screening, oversight, and licensing because they are in unions. For example, almost all of the Securitas and Group 4 Securicor employees in their Scandinavian home countries are union members.
- In Finland, Securitas worked with Finnish trade unions to set up the Finnish Guard Training Center. In Austria, both Securitas and Group 4 developed a basic training course and negotiated with their unions to have it inserted in the collective bargaining agreement.
- Only 8 percent of private security officers in the U.S. are members of a union.
- With more than 50,000 public and private security and safety officers, the Service Employees International Union (SEIU) is the largest security officers' union in the U.S. SEIU represents private security officers in Chicago, New York, San Francisco, and Minneapolis.

[i] Private Security Services to 2006, Freedonia Group, April 2002.

[ii] The 2001 National Occupational Employment and Wage Estimates published by the US Bureau of Labor Statistics (BLS) states there are 995,000 security officers. This figure does not include proprietary or "in-house" security workers. We add another 10% to account for these workers in our estimate.

[iii] 2001 National Occupational and Wage Estimates.

[iv] The US BLS lists the occupation of security guard in the top 10 of occupations expected to have the largest job growth between 2000-2010.

[v] Private Security Services to 2006, Freedonia Group

[vi] From surveys conducted by Peter D. Hart Research Associates in CA, TX and FL. June 2002

[vii] 1997 Economic Census: Comparative Statistics for the United States, US Department of Census

## Related Links

- Undertrained, Underpaid, and Unprepared: Security Officers

Report
This 2005 report shows that despite the heightened orange
security alert New York City has been under since 9/11,
alarmingly few of the City's private security officers are trained to
respond to terrorism, interface with police, or work with
firefighters during an emergency.

○ Guarding America: Security Guards and US Critical Infrastructure
Protection
This 2004 Congressional Research Service report analyzes
trends in qualifications, training, deployment, and wages
concerning security guards in the US post 9/11.

○ A Post-September 11 Report on Surveys of Security Officers in
California, Texas, and Florida, June 2002
Despite varying state requirements, survey results from Peter D.
Hart Research Associates consistently shows a lack of training
for security officers and lax security procedures at buildings in all
three states and therefore point to some likely national trends.

Share:

Home | About SEIU | Contact Us | SEIU Store | Press Releases | Privacy Policy

© 2007 SEIU - Service Employees International Union® CTW, CLC

# SEIU® *Stronger Together*

Service Employees International Union® CTW, CLC

1.8 Million members and g

## Property Services Workers

Stand for Security

Justice for Janitors

## Property Services FAQs

What Is Property Services?

What Is Justice for Janitors?

What Is Stand for Security?

Why Do We Need a Property Services Union?

Who Can Get Involved and How Can I Join?

## Property Services Resources

About SEIU

Media Center

Political Action

Member Benefits and Education

Community Center

Jobs

En español

Property Services   FAQs

# What Is Stand for Security?

Stand for Security is a national, community-based campaign to build stronger communities by helping hundreds of thousands of African-American security officers win a better future.

Private security officers and SEIU have launched the largest organizing effort of a predominantly African-American workforce in the history of the labor movement. By organizing the Pullman Porters union in 1937, A. Philip Randolph helped create the black middle class. Security officers nationwide are building on that legacy by uniting in SEIU.

We are just getting started. There are more than a million private security officers already working in one of the nation's fastest growing industries. Imagine the potential for our communities if wealthy building owners can turn private security into a steady, good-paying job with health care.

Learn more about Stand for Security.

## Property Services Issues

Living Wages

Security Officer Training

Job Turnover

ISSUE SPOTLIGHT ON

## Affordable Health Care

Wealthy building owners have access to state-of-the-art health care while officers who guard their buildings can't afford doctors' visits.

More »



SIGN UP FOR ACTION ALERTS
Receive e-mails about important issues & online actions.

PurpleOcean.org
Take a Stand
Make a Difference

Share:

Home | About SEIU | Contact Us | SEIU Store | Press Releases | Privacy Policy

© 2007 SEIU - Service Employees International Union® CTW, CLC



## Stand for Security

Home

Los Angeles Security Officers Unite!

I am Security

Wages and Working Conditions

For Security Officers

Building Stronger Communities, Safer Buildings

Campaign Supporters

Join Us

Frequently Asked Questions

Media



Security Officers are leading the largest organizing effort of African American workers in the history of the labor movement.

Search

| GO |

A lack of good jobs is devastating the African American community. A national, community-based campaign to organize security officers, however, is bringing hope to hundreds of thousands of black workers and their families.

Private security officers and the Service Employees International Union (SEIU) have launched the largest organizing effort of a predominantly African American workforce in history. By organizing the Pullman Porters union in 1937, A. Phillip Randolph helped create the black middle class. With your help, we will build on this legacy by helping 200,000 security officers nationwide unite with SEIU.

We are just getting started. There are more than a million private security officers already working in one of the nation's fastest-growing industries. Imagine the potential for our communities if we can turn private security into a steady, good paying job with health care.

### Security Officers Need Protection Too

Security officers are asked to protect the most prestigious addresses in our cities and the offices of the wealthiest corporations. But they often do their jobs for less than $10 an hour, even after years of service. They are "offered" health insurance they cannot afford. They get no paid sick days. Without good pay and benefits, workers and their families are left unprotected.

### The African American Community's Health is at Stake

Turning dead-end jobs into union jobs will bring millions of dollars into our communities. In Los Angeles alone, a union contract for security officers could bring more than $100 million each year into the city's poorest neighborhoods. And that's just one city. When security officers across the country win the health care and wages they need, thousands of fathers and mothers home paychecks they can be proud of and finally get the respect they earn each and on the job.



I am SECURI



HOW CAN I KEEP TH
TENANTS SAFE + SE
WHEN I DON'T HAVE
AFFORDABLE HEALTH
FOR MYSELF OR MY

—Security Officer Kevin
Washi

## Watch a Video o
## Security Officers
## Taking Action!

### Windows Media:
» Dial-Up
» Broadband

### RealPlayer:
» All Speeds

◉ Full Site
○ This Section

Search Tips

**Build stronger communities
& safer buildings in your city.**

» Boston    » LA    » SF
» Chicago    » NY    » Seattle
» DC    » Twin Citi

For more information or to get involved, write to info@standforsecurity.org

Home | Los Angeles Security Officers Unite! | I am Security | Wages and Working Conditions | For Security Officers | Building Stronger Con
Buildings | Campaign Supporters | Join Us | Frequently Asked Questions | Media

powered by AdvocateOffice.com



## Campaign Supporters

Security officers, community leaders, clergy and communities of faith are leading the organizing effort of African American workers in the history of the labor movement to wages, benefits and training and to strengthen our communities by forming a union w Service Employees International Union (SEIU).

The National Association for the Advancement of Colored People (NAACP) and the Christian Leadership Conference (SCLC) have both passed resolutions in support of officers working to improve their lives while at the same time lifting up the black comr

NAACP and SCLC [pdf]   |   Coalition of Ministers [pdf]

Clergy and community leaders such as the Rev. Jesse Jackson, Rev. James Lawsor Senator John Edwards are also working with security officers to stand for security.

## National Supporters

A. Philip Randolph Institute

Coalition of Black Trade Unionists

Martin Luther King Legacy Association

National Association for the Advancement of Colored People (NAACP)

Rev. Jesse Jackson
Rainbow/PUSH Coalition

Rev. James Lawson
Southern Christian Leadership Conference (SCLC)

Sen. John Edwards
United States Senate

Del. Eleanor Holmes Norton
Rep. Maxine Waters
Rep. Diane Watson
Unites States House of Representatives

You can also view more state and local supporters by city:
» Boston
» Twin Cities
» Washington D.C.

For more information or to get involved, write to info@standforsecurity.org

**Home**

**Los Angeles Security Officers Unite!**

**I am Security**

**Wages and Working Conditions**

**For Security Officers**

**Building Stronger Communities, Safer Buildings**

**Campaign Supporters**

**Join Us**

**Frequently Asked Questions**

**Media**

**Security Officers** are leading the largest organizing effort of African American workers in the history of the labor movement.

**Search**

[ GO ]



## Frequently Asked Questions

Home

Los Angeles Security Officers Unite!

I am Security

Wages and Working Conditions

For Security Officers

Building Stronger Communities, Safer Buildings

Campaign Supporters

Join Us

Frequently Asked Questions

Who's Got the Power?

The SEIU Organizing Model

Media



**Security Officers** are leading the largest organizing effort of African American workers in the history of the labor movement.

Search

**Q. Is it legal for security officers to join SEIU?**

A. Yes. In an effort to prevent security officers from exercising their basic legal right to join the union of their choice, some building owners and contractors imply that som cannot legally represent security officers. This is not true. The misleading claims are part of federal labor law – Section 9(b)(3) of the National Labor Relations Act – that officers cannot use an NLRB election process to have their union recognized if that u represents other kinds of workers, for example, janitors.

What these employers aren't telling, however, is that security officers do not have to an NLRB election process to form a union. For more details, please refer to the lega authored by Dr. James Truesdale, former chairman of the National Labor Relations I

The building owners and security contractors that reference this issue are using a pe labor law as a modern-day poll tax to prevent security officers from exercising their f human and civil right to choose which union they want to join.

Here are the facts:
• Nationwide, 25,000 private security officers as well as more than 225,000 janitors h become members of SEIU without utilizing the NLRB process.

• SEIU is the country's largest union of private security officers. More than 50,000 pr security officers and public safety personnel are members of SEIU.

• Security officers who are members of SEIU are protected by the National Labor Re

• SEIU has represented security officers, janitors, and other building workers in the s buildings in New York City, Chicago, San Francisco, Minneapolis/St. Paul and other sometimes for more than 50 years.

• Buildings where SEIU security officers and janitors work side by side include the So in Chicago, the Transamerica Pyramid in San Francisco, and Rockefeller Center in N City.

• Most of the largest building owners have SEIU security officers working at their pro major U.S. cities.

**Q. What is the process for security officers to join SEIU and gain union repres**

A. The process that security officers around the country are using to gain union repr called "card-count recognition." It simply involves an employer "recognizing" a union

GO

◉ Full Site
◯ This Section

Search Tips

majority of the workers has indicated its support for joining that union by signing unic
Card-count recognition is a legal, fair, and widely accepted process for workers to joi
of their choice.

The card-count recognition process is often accompanied by an agreement between
employer and the union to stay neutral as the workers decide whether or not they wa
the union. This means that the employer agrees not to interfere with the employees'
about whether to join the union, and the employees and the union agree not to disru;
workplace through strikes, picketing or boycotts. In many neutrality agreements, inde
third parties are brought in to quickly resolve conflicts.

Card-count recognition is a very common process for union recognition in the U.S. p
services industry.

Major employers who have agreed to card-count neutrality agreements include Kaise
Permanente, Securitas, U.S. Steel, AT&T, Safeway, Anheuser-Busch, UPS, and Hilt

**Q. What about concerns that security officers could go on strike once they joir
leaving properties unprotected?**

A. Recognizing the unique and important role of security officers in protecting people
property, every SEIU security contract guarantees that officers will not strike, and wil
participate in work stoppages or other actions involving workers represented by SEIl
other union.

For more information or to get involved, write to info@standforsecurity.org

Home | Los Angeles Security Officers Unite! | I am Security | Wages and Working Conditions | For Security Officers | Building Stronger Con
Buildings | Campaign Supporters | Join Us | Frequently Asked Questions | Media

powered by AdvocateOffice.com

# EXHIBIT 3

PAGE 2/2 * RCVD AT 7/14/2005 3:47:59 PM [Eastern Daylight Time] * SVR:DCNTFAX01/0 * DNIS:6285116 * CSID:9 312 886 1341 * DURATION (mm-ss):01-10

## ATTACHMENT TO SETTLEMENT AGREEMENT

**A. The following paragraphs of the Settlement Agreement are amended as follows:**

**POSTING OF NOTICE:** Upon approval of this Agreement and receipt of Notices from the Region, the Charged Party will post immediately in the below-specified locations for 60 consecutive days from the date of posting, copies of the attached Notice made a part hereof, said Notices to be signed by a responsible official of the Charged Party and the date of actual posting to be shown thereon. Because this Agreement is in settlement of a charge against a union, the union shall submit forthwith signed copies of said Notice to the Regional Director, who shall forward them to the employer whose employees are involved herein for posting, the employer willing, in conspicuous places in and about the employer's facilities located in the Chicago, Illinois area covered by the parties "Suburban Agreement;" in the employer's facilities in San Francisco, California covered by the collective bargaining agreement between the parties; and in the employer's facilities in or near the following cities in which Wackenhut Corporation has clients: Murray Hill, NJ; Morristown; NJ, Jonestown, PA; Houston, TX; Sugarland, TX; Fort Lauderdale, FL; and Burlington, MA, where they shall be maintained for 60 consecutive days from the date of posting. Further, in the event the charged union maintains a bulletin board at said facilities of the employer, the union shall also post Notices on such bulletin board during the posting period.

Posting locations:

1. Service Employees International Union office in Washington, DC.
2. Service Employees International Union, Local 1 office in Chicago, IL.
3. Service Employees International Union, Local 24/7 office in San Francisco, CA.
4. Service Employees International Union or SEIU local union office in or nearest to Murray Hill, NJ.
5. Service Employees International Union or SEIU local union office in or nearest to Morristown, NJ.
6. Service Employees International Union or SEIU local union office in or nearest to Jonestown, PA.
7. Service Employees International Union or SEIU local union office in or nearest to Houston, TX.
8. Service Employees International Union or SEIU local union office in or nearest to Sugarland, TX.
9. Service Employees International Union or SEIU local union office in or nearest to Fort Lauderdale, FL.
10. Service Employees International Union or SEIU local union office in or nearest to Burlington, MA.

In addition, the Charged Party will submit forthwith signed copies of the attached notice to the Regional Director, who shall forward them to the affected clients of the Employer as named in the notice for posting, if they desire, at their affected locations for their employees.

**SCOPE OF THE AGREEMENT:** This Agreement settles only the allegations in the above-captioned case, and does not constitute a settlement of any other cases or matters, including the charges pending in Case No. 13-CB-17857 and Case No. 13-CB-18019. It does not preclude persons from filing charges, the

General Counsel from prosecuting complaints, or the Board and the courts from finding violations with respect to matters which precede the date of the approval of this Agreement regardless of whether such matters are known to the General Counsel or are readily discoverable.  The General Counsel reserves the right to use the evidence obtained in the investigation and prosecution of the above-captioned cases for any relevant purpose in the litigation of this or any other cases, including Case No. 13-CB-17857 and Case No. 13-CB-18019, and a judge, the Board, and the courts may make findings of fact and/or conclusions of law with respect to said evidence.

**B. The following paragraph is added to the Settlement Agreement:**

**NONADMISSIONS CLAUSE:** By entering into this Settlement Agreement, the Charged Party does not admit that it has violated the National Labor Relations Act.

H:\R13COM\Regional Document Archive\Settlement Agreements\13-CC-2511.doc 6/8/2005 9:08 AM



DRAFT NOTICE - APPROVED NOTICE FOR POSTING WILL BE PRINTED ON AN OFFICIAL NLRB
FORM

  

# NOTICE TO
# EMPLOYEES
# AND
# MEMBERS

## POSTED PURSUANT TO A SETTLEMENT AGREEMENT
## APPROVED BY A REGIONAL DIRECTOR OF THE
## NATIONAL LABOR RELATIONS BOARD
### AN AGENCY OF THE UNITED STATES GOVERNMENT

SERVICE EMPLOYEES INTERNATIONAL UNION
Case: 13-CC-2511

WE WILL NOT threaten to picket; engage in unlawful demonstrations including those which involve trespass or loud noise or otherwise disrupt normal business operations; or otherwise threaten, coerce or restrain any clients of Wackenhut Corporation throughout the United States (including but not limited to Allied Signal/Honeywell, AT&T, Bank of America, Chevron/Texaco, Dell, First Data Corporation, Florida Power and Light, IBM, Ingram Micro, Lucent, Oracle, Publix, and Qwest) with an object of forcing or requiring those clients to cease doing business with Wackenhut Corporation.

WE WILL NOT threaten to picket; engage in unlawful demonstrations including those which involve trespass or loud noise or otherwise disrupt normal business operations; or otherwise threaten, coerce or restrain any clients of Wackenhut Corporation throughout the United States (including but not limited to Allied Signal/Honeywell, AT&T, Bank of America, Chevron/Texaco, Dell, First Data Corporation, Florida Power and Light, IBM, Ingram Micro, Lucent, Oracle, Publix, and Qwest) with an object of forcing or requiring Wackenhut Corporation to recognize SEIU or any of our local unions as the exclusive collective bargaining representative of Wackenhut Corporation employees.

WE WILL NOT hire, direct, authorize, ratify, condone or otherwise cause third parties, including but not limited to the Prewitt Organizing Fund, PROTECTS USA, or any state, local or affiliated PROTECTS organization, to threaten to picket; engage in unlawful demonstrations including those which involve trespass or loud noise or otherwise disrupt normal business operations; or otherwise threaten, coerce or restrain any clients of Wackenhut Corporation throughout the United States (including but not limited to Allied Signal/Honeywell,

AT&T, Bank of America, Chevron/Texaco, Dell, First Data Corporation, Florida Power and Light, IBM, Ingram Micro, Lucent, Oracle, Publix, and Qwest) with an object of forcing or requiring those clients to cease doing business with Wackenhut Corporation.

WE WILL NOT hire, direct, authorize, ratify, condone or otherwise cause third parties, including but not limited to the Prewitt Organizing Fund, PROTECTS USA, or any state, local or affiliated PROTECTS organization, to threaten to picket; engage in unlawful demonstrations including those which involve trespass or loud noise or otherwise disrupt normal business operations; or otherwise threaten, coerce or restrain any clients of Wackenhut Corporation throughout the United States (including but not limited to Allied Signal/Honeywell, AT&T, Bank of America, Chevron/Texaco, Dell, First Data Corporation, Florida Power and Light, IBM, Ingram Micro, Lucent, Oracle, Publix, and Qwest) with an object of forcing or requiring Wackenhut Corporation to recognize us or any of our local unions as the exclusive collective bargaining representative of Wackenhut Corporation employees.

WE WILL instruct in writing, and provide a copy of such writing to the Region, the Prewitt Organizing Fund to not (either directly or through their agents):

1.  Threaten to picket; engage in unlawful demonstrations including those which involve trespass or loud noise or otherwise disrupt normal business operations; or otherwise threaten, coerce or restrain any clients of Wackenhut Corporation throughout the United States (including but not limited to Allied Signal/Honeywell, AT&T, Bank of America, Chevron/Texaco, Dell, First Data Corporation, Florida Power and Light, IBM, Ingram Micro, Lucent, Oracle, Publix, and Qwest) with an object of forcing or requiring those clients to cease doing business with Wackenhut Corporation.

2.  Threaten to picket; engage in unlawful demonstrations including those which involve trespass or loud noise or otherwise disrupt normal business operations; or otherwise threaten, coerce or restrain any clients of Wackenhut Corporation throughout the United States (including but not limited to Allied Signal/Honeywell, AT&T, Bank of America, Chevron/Texaco, Dell, First Data Corporation, Florida Power and Light, IBM, Ingram Micro, Lucent, Oracle, Publix, and Qwest) with an object of forcing or requiring Wackenhut Corporation to recognize SEIU or any of our local unions as the exclusive collective bargaining representative of Wackenhut Corporation employees.

WE WILL NOT in any like or related manner restrain or coerce employees of Wackenhut Corporation or its clients in the exercise of the rights guaranteed to them by Section 7 of the Act.

SERVICE EMPLOYEES INTERNATIONAL UNION
(Respondent)

Dated: __6/9/05__    By: _____    _____
                          (Representative)                (Title)

JUL-14-2005  02:48        NLRB                    9 312 886 1341    P.06
JUN-09-2005  21:48        NLRB                    9 312 886 1341    P.06

The National Labor Relations Board is an independent Federal agency created in 1935 to enforce the National Labor Relations Act.  We conduct secret-ballot elections to determine whether employees want union representation and we investigate and remedy unfair labor practices by employers and union.  To find out more about your rights under the Act and how to file a charge or election petition, you may speak confidentially to any agent with the Board's Regional Office set forth below.  You may also obtain information from the Board's website: www.nlrb.gov.

200 West Adams, Suite 800               Telephone: (312) 353-7570
Chicago, Illinois  60606-5208          Hours of Operation: 8:30 a.m. to 5:00 p.m.

# EXHIBIT 4

INTERNET
FORM NLRB-509
(5-80)

UNITED STATES OF AMERICA

FORM EXEMPT UNDER
44 U.S.C. 3512

NATIONAL LABOR RELATIONS BOARD

## CHARGE ALLEGING UNFAIR LABOR PRACTICE UNDER SECTION 8(e) OF THE NLRA

| INSTRUCTIONS: File an original and 3 copies of this charge, and an additional copy for each organization, each local, and each individual named in item 1 with the NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring. |
|---|

| CASE NUMBER | DATED FILED | 1. CHARGE FILED AGAINST: | | |
|---|---|---|---|---|
| | 10/04/2006 | Employer and Labor Organization [X] | Employer [ ] | Labor Organization [ ] |

| a. Name of Labor Organization *(Give full name, including local name and number)* SEIU Local 1 | b. Union Representative to Contact Thomas Balanoff, President | c. Telephone Number 312-240-1600 |
|---|---|---|

| d. Address *(Street and number, city, State, and ZIP Code)* 111 E. Wacker Drive, Suite 2500, Chicago, Illinois 60601 | | |
|---|---|---|

| e. Name of Employer Chicago Building Owners and Managers Association ("BOMA") | f. Employer Representative to Contact Lisa Goldstein | g. Telephone Number 312-236-5237 |
|---|---|---|

| h. Location of Plant Involved *(Street, city, State, and ZIP Code)* SEIU/BOMA Buildings, 120 S. LaSalle Street, Suite 1400, Chicago, IL  60603 | | |
|---|---|---|

| i. Type of Establishment *(Factory, mine, wholesaler, etc.)* Office buildings | j. Identify Principal Product or Service security for office buildings | k. No. of Workers Employed Greater than 1,000 |
|---|---|---|

| The above-named labor organization or its agents, and/or employer(s) has (have) engaged in and is (are) engaging in unfair labor practices within the meaning of section 8(e) of the National Labor Relations Act, and these unfair labor practices are unfair labor practices affecting commerce within the meaning of the Act. |
|---|

2. Basis of the Charge *(Be specific about facts, names, plants involved, dates, and places.)*

The charged parties have entered into, confirmed, reaffirmed, maintained, and enforced an agreement that requires building owners and managers in the Chicago area to cease doing business with any security contractor that does not have an agreement with SEIU Local 1. Additionally, SEIU Local 1 has engaged in a pervasive course of conduct designed to ensure that no Chicago/BOMA Member does business with any security contractor who refuses to sign an SEIU agreement.

| 3. Full Name of Party Filing Charge *(If labor organization, give full name, including local name and number)* The Wackenhut Corporation | |
|---|---|

| a. Address *(Street and number, city, State, and ZIP Code)* P.O. Box 109603, 4200 Wackenhut Drive, Palm Beach Gardens, Florida  33410-4243 | b. Telephone Number 561-691-6637 |
|---|---|

| 4. Full Name of National or International Labor Organization of Which It is an Affiliate or Constituent Unit *(To be filled in when charge is filed by a labor organization)* |
|---|

| 5. DECLARATION I declare that I have read the above charge and that the statements therein are true to the best of my  knowledge and belief. | | |
|---|---|---|
| By *(Type/Print name of representative or person filing charge)* Dennis M. Devaney | Title, if any Attorney & Counselor | Telephone Number 248-205-2766 |
| Address 300 E. Long Lake Road, Ste 200, Blmfld Hills, MI 48304 | Signature *Dennis M. Devaney* | Date Filed by FedEx Overnight shipment on 10/4/06 to NLRB Region 13, Chicago, IL Docketed by Region 13 on 10/5/2006 |



ATTORNEYS & COUNSELORS

300 East Long Lake Road  Suite 200
Bloomfield Hills  Michigan  48304-2376

t  248 540 2300
f  248 645 2690
www.stroblpc.com

Dennis M. Devaney, Esq.
Direct Dial:  248-205-2766
Email: ddevaney@stroblpc.com

October 4, 2006

Joseph A. Barker, Regional Director
National Labor Relations Board - Region 13
The Rookery Building
209 South LaSalle Street, Suite 900
Chicago, IL 60604

Re:    **Wackenhut's Section 8(e) Charge against SEIU and BOMA/Chicago**

Dear Mr. Barker:

The Wackenhut Corporation ("Wackenhut") submits this statement of position in support of its charge that Local 1 of the Service Employees International Union ("SEIU"), and the Chicago Building Owners and Managers Association ("BOMA"), have violated Section 8(e) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*  The charged parties have entered into, maintained, and enforced an agreement that requires building owners and managers to cease doing business with any security contractor that does not have an agreement with the SEIU.  In addition, the SEIU has engaged in a pervasive course of conduct designed to insure that no BOMA member does business with any party who refuses to sign an SEIU agreement.

As demonstrated below, there is no doubt that the agreement and course of conduct constitute illegal activity.  On its face, the collective bargaining agreement between BOMA and the SEIU is unlawful, containing a clause requiring subcontractors to comply with all the terms of that agreement, and not merely the economic standards of that agreement.  Indeed, the SEIU and BOMA have quite bluntly stated that a "contractor's obligation to follow [the SEIU's agreement with BOMA] should be incorporated into the agreement with the contractor."  *See* June 3, 2004, Memorandum from Ron Vukas, the Executive Vice President of BOMA, attached as **Exhibit 1**.  Other language in the subcontracting clause, as well as the parties' practices in the application of the agreement, provide further evidence of the illegal intent and application of the subcontracting clause.

The SEIU clause on its face and as applied violates Section 8(e) and should be set aside.

## I.    STATEMENT OF FACTS

### A.    Background

BOMA is a national association of building owners and managers that seeks to advance its members' common agenda.  BOMA also has chapters in various cities that exist primarily to address local issues.  In many cities, including Chicago, BOMA will establish a labor committee for the purpose of engaging in collective bargaining on behalf of its members.  BOMA, thus, acts as  a multi-employer bargaining association which enters into agreements to which its members are bound.

In most major cities in the United States, private commercial office buildings are protected by security officers.  Building owners and managers rarely, if ever,  employ these security guards directly.   Rather, building owners and managers enter into contracts with  third-party security firms to provide security guard services on a subcontracted basis.  Security contracts most often are awarded by competitive bid, with a building owner or manager sending a request for proposal to a number of security guard companies.  The successful security guard company then provides professional security guards and related services to meet the particular owner's or manager's needs.

This pattern is true in Chicago where virtually every major office building and complex in downtown Chicago is protected by a security force of some nature.  In the downtown Chicago area alone, there are over 200 BOMA buildings that use security guards. The SEIU negotiates and maintains collective bargaining agreements governing security guards with BOMA and many of the security guard contractors in the Chicago area, including Wackenhut.

### B.    The Relevant Collective Bargaining Agreements And Negotiations

#### 1.    The SEIU-BOMA Agreement

The SEIU and BOMA are signatories to a collective bargaining agreement ("SEIU-BOMA Agreement") covering a bargaining unit "of all non-supervisory full and part-time security employees...including elevator operators, starters and assistant starters employed by them in the buildings which are now or may hereafter be covered by this Agreement . . . . "  *See* SEIU-BOMA Agreement, attached as **Exhibit 2**.  The SEIU-BOMA Agreement has an effective date of April 26, 2004, and will expire by its terms on April 29, 2007.  On information and belief, no BOMA member employed any

employee covered by the agreement at the time of its negotiation and execution, nor does any BOMA member employ security guards today.[1]

Article XXIII of the SEIU-BOMA Agreement imposes restrictions on the subcontracting of security services by BOMA members. Article XXIII provides that:

> With respect to any subcontractor that does not have a collective bargaining agreement with the Union, the Employer shall require that said contractor will meet *all of the standards* of this Agreement.

*See* Exhibit 2 (emphasis added).

Article XXIII also states that the SEIU-BOMA Agreement displaces any contracts between the SEIU and security guard companies for security guard work performed in buildings in which the SEIU-BOMA Agreement applies. Specifically, the agreement provides that:

> In the event that the Employer subcontracts to a security contractor which is a party to a collective bargaining agreement with the Union, the terms and conditions of this Agreement shall be the only terms and conditions applicable to said contractor and its employees working in the Employer's building notwithstanding the particular terms and conditions contained in any collective bargaining agreement between the Union and such security contractor.

*Id.*

On June 3, 2004, Ron Vukas circulated a memorandum announcing that BOMA had reached a new agreement with the SEIU governing security guard services in BOMA buildings. In that memorandum, Mr. Vukas stated:

> Please note that the BOMA/Chicago—SEIU Local 1 Security Agreement should be followed in **all** BOMA buildings that are signatory to the Security Agreement. <u>If your building uses a contractor to employ security personnel, the contractor's obligation to follow this collective bargaining</u>

---

[1] Wackenhut and other security guard contractors with which it has discussed this issue are not aware of any BOMA member that employs its own security guards, but has been unable to establish conclusively that this is the case. The Region, in its investigation, must address this issue.

> agreement should be incorporated into the agreement with
> the contractor.    Please ensure that the contractor
> understands this fact and receives a copy of this agreement
> to follow.

See Exhibit 1 (emphasis in original).

Mr. Vukas' memorandum includes a summary of changes contained in the new SEIU-BOMA Agreement.  With respect to the grievance procedure, the memorandum states:

> Grievances involving security contractors working in BOMA
> signatory buildings will now be processed under the
> grievance procedure contained in the BOMA-Local 1
> Agreement, rather than the grievance procedure in the
> security contractor's agreement with the Union.

Id.

By letter dated June 8, 2004, to Joe Krol, then Wackenhut's Area Branch Manager, Mona Ballenger, the SEIU's Security Director, reiterated the statements in Mr. Vukas' memorandum.  In her letter, Ms. Ballenger stated:

> Enclosed is a copy of the  newly signed BOMA contract that
> covers Downtown Security Officers.  I have also enclosed a
> copy of the Memo that BOMA recently distributed to its
> buildings and the Security contractors which you may or may
> not have received.

> Everything is retroactive to April 26, 2004.  Please bill, but
> hold all training contributions until further notice, we are
> currently still in the setup process.

See June 8, 2004, letter from Mona Ballenger to Joe Krol, attached as Exhibit 3.

Negotiations for the SEIU-BOMA Agreement are used by the SEIU to establish the standards for security subcontractors.  During the last round of bargaining in 2004, the SEIU refused to negotiate with any security guard contractor until it concluded a new SEIU-BOMA Agreement.  On April 12, 2004, Mona Ballenger, the SEIU's Security Director, sent a letter to Joe Krol requesting an extension of Wackenhut's agreement with the SEIU so that the SEIU could first conclude its bargaining with BOMA.  In her letter, Ms. Ballenger stated that:

> [a]s in the past, BOMA Chicago negotiations determine the
> Security Officer Area Standards for the downtown Security
> Contractor Collective Bargaining Agreement.

A copy of Mona Ballenger's April 12, 2004 letter to Joe Krol is attached as **Exhibit 6**.

### 2.    Agreements with Security Guard Contractors

The SEIU maintains two separate contracts with security guard contractors in the Chicago market, loosely referred to as the "Downtown Agreement," and the "Suburban Agreement."[2]  Each Agreement covers buildings in a specifically-defined geographic area in the Chicago region.  The Downtown Agreement governs security officers employed in "all commercial office buildings in the 'Chicago central area' bounded by Roosevelt Road, Lake Michigan, North Avenue and Racine Avenue… The Suburban Agreement governs security officers employed in "all commercial office buildings located south of Roosevelt Road, west of Halstead Street, north of Division Street within the geographic area described in Appendix A where a Local 1 [SEIU] Suburban Janitorial Contract exist [sic]."[3]

The Downtown Agreement contains clauses that assume that only contractors with SEIU agreements will perform work in "SEIU" buildings.  Article VIII, Section 2, of the Agreement, for example, requires that in the event that the signatory employer's contract for the building is terminated, the successor contractor is obligated to pay accrued benefits to employees.  Similarly, Article XV, Section 1 provides that a change in contractors in the building will not affect an employee's seniority rights.  Because these rights are based on an SEIU agreement, only signatory contractors can comply with this language.

The Downtown Agreement contains language confirming the preemptive effect of the SEIU-BOMA Agreement.  On March 2, 2005, Mona Ballenger sent a letter to Wackenhut, with a copy to Ron Vukas, transmitting a "corrected page 1" of Wackenhut's agreement.   That correction implemented the current language of Wackenhut's agreement with the SEIU, which provides:

---

[2] While the Suburban Agreement is negotiated by contractors individually, the Downtown Agreement historically was negotiated by the Associated Guard & Patrol Agencies ("AGPA"), a multi-employer bargaining group.

[3] While Wackenhut is a signatory to the Downtown Agreement, the SEIU disclaimed interest in maintaining a Suburban Agreement with Wackenhut. *See* letter dated July 29, 2003, from Tom Balanoff, President SEIU Local 1, to Guy Wegener, then Vice President Labor Relations for Wackenhut, attached as Exhibit 8.

> If there is any conflict between the BOMA/SEIU Local 1
> Security Collective Bargaining Agreement and this
> Agreement in BOMA Security Signatory Buildings, the
> parties to this Agreement agree that the BOMA/SEIU Local 1
> Security Collective Bargaining Agreement shall govern and
> agree to be bound by the terms and conditions of the
> BOMA/SEIU Local 1 Security Collective Bargaining
> Agreement.

A copy of the Agreement between Wackenhut and the SEIU is attached as **Exhibit 4**. As Ms. Ballenger explained, the purpose of the correction was to make "clear" that the SEIU-BOMA Agreement "supersedes the contractor agreement" in BOMA buildings. A copy of Ms. Ballenger's letter is attached as **Exhibit 5**.

### C.    Subcontracting Practices Under The Chicago Guard Agreements

Article XXIII of the SEIU-BOMA Agreement requires security contractors to comply with all the terms of the agreement. It is common knowledge in Chicago that BOMA buildings must be bid according to the SEIU-BOMA Agreement, and that the work can be done only by SEIU represented subcontractors. The SEIU has told security guard subcontractors, and otherwise made it well known throughout the industry, that security guard companies cannot provide services in BOMA buildings in Chicago unless they comply with the terms of the SEIU-BOMA Agreement. In fact, not a single BOMA building is contracted to a security contractor that does not adhere to the SEIU agreement. For this reason, buildings governed by the SEIU-BOMA Agreement are referred to as "SEIU Buildings" by the SEIU and employers.

The SEIU and BOMA also require that all grievances in BOMA buildings are handled under the SEIU-BOMA Agreement. By an e-mail dated August 6, 2004, Ron Vukas explained that any grievances would be processed under the SEIU-BOMA Agreement . . . ." Mr. Vukas further explained that the problem with allowing subcontractors to control the grievance process was that "[b]ecause our contractors are not agents, we were concerned that a Step III procedure that included contractors in lieu of BOMA members would naturally be attuned to contractors' interests and concerns rather than that of our members." Accordingly, Mr. Vukas stressed that "[t]he manager of a building involved in a grievance that proceeds to Step III is <u>NOT</u> required by our contract to attend the Labor-Management Committee grievance hearing." A copy of Ron Vukas' August 6, 2004, e-mail is attached as **Exhibit 7**.

Subsequently, by letter dated September 1, 2005, Edward Bowen, Lead Union Representative for the SEIU, wrote Glenn Kraemer of Wackenhut reiterating that the SEIU-BOMA Agreement's arbitration controlled in BOMA buildings. With respect to a dispute over what grievance procedure applied, Mr. Bowen stated that the SEIU was "confident" that it followed "the proper procedure and steps set forth" in the SEIU-BOMA Agreement. A copy of Mr. Bowen's September 1, 2005, letter is attached as **Exhibit 9**. Similarly, by letter dated October 11, 2005, Mr. Bowen filed a grievance on behalf of a Wackenhut employee "[p]ursuant to Article XVIII, Section 1, Step II of the" SEIU-BOMA Agreement. A copy of Mr. Bowen's October 11, 2005, letter is attached as **Exhibit 10**.

BOMA insures that subcontractors comply with the SEIU-BOMA Agreement by requiring subcontractors to bid security guard work based on the SEIU-BOMA Agreement.

### D. The September 2006 BOMA Labor Seminar And The BOMA Labor Relations Manual

BOMA regularly holds seminars to explain to contractors how to apply the SEIU-BOMA Agreement. On September 13, 2006, BOMA held one of its labor seminars explaining the contracting practices established by the SEIU-BOMA Agreement. Richard Files, Wackenhut's General Manager in Chicago, attended the seminar. The initial session of the seminar focused on the recently signed SEIU-BOMA janitorial contract. A copy of the SEIU-BOMA janitorial contract is attached as **Exhibit 12**, Appendix I. During the meeting, George Conopeotis, a BOMA representative, stated that under subcontracting language in the janitorial contract, janitorial subcontractors were required to comply with all the terms of the agreement between BOMA and the SEIU.

Following the discussion of the janitorial contract, the BOMA representatives discussed the security guard agreement. That discussion focused on the SEIU security guard training trust that had been implemented. Following the meeting, Mr. Flies approached Marcia Rubinstein (phonetic) to discuss the application of the SEIU-BOMA Agreement. Specifically, Mr. Flies asked what agreement applied to security guard work performed by Wackenhut in BOMA buildings. Ms. Rubinstein responded by explaining that the SEIU-BOMA Agreement applied.

Participants at the seminar received a copy of a manual titled, "Labor Relations Manual A reference Guide to BOMA/Chicago Labor Contracts." A copy of the 2006 Labor Relations Manual is attached as **Exhibit 11**. On its cover page, the manual states that it is the "Revised 2006 Edition." In a section titled "Purpose of the Manual," the Labor Relations Manual states that:

The purpose of both the seminar and this manual is to empower BOMA members with helpful information and tools for more effectively dealing with their union employees *and their relationships with the employees of subcontractors* providing service in BOMA/Chicago signatory buildings.

*See* Exhibit 11 (emphasis added).

The Labor Relations Manual also explains the subcontracting restrictions contained in the SEIU-BOMA Agreement. Under the heading "Conditions for Subcontracting," the Labor Relations Manual states:

2.    If subcontractor is party to an agreement with the Union, the BOMA/Chicago-SEIU, Local 1 Security Agreement terms and conditions govern.

3.    If subcontractor is not a party to an agreement with the Union, building shall require the contractor to meet all of the standards of the BOMA/Chicago-SEIU, Local 1 Security Agreement.

*See* Exhibit 11.

The Labor Relations Manual then goes on to explain the effect of a subcontractor's refusal to comply with the SEIU-BOMA Agreement in a section titled "Effect of Subcontractor's Breach of Obligations." As explained by BOMA:

Grievances alleging subcontractor's non-performance are to be processed under the BOMA/Chicago-SEIU, Local 1 Security Agreement grievance procedure (See Grievance Procedure). If the grievance is ultimately upheld and the subcontractor refuses to implement the remedy imposed, the building must terminate its contract with the subcontractor within 60 days after written notice by the Union.

*See* Exhibit 11.[4]

---

[4] These provisions have been in the Labor Relations Manual since at least 2004. See Labor Relations Manual, 2004 Revised Edition, attached as Exhibit 12.

## II.     SUMMARY OF LEGAL PRINCIPLES

Section 8(e) of the NLRA, 29 U.S.C. 158(e), makes it an unfair labor practice to enter into any agreement, express or implied, where an employer agrees to cease doing business with any other person.[5]   A subcontracting clause will violate Section 8(e) if "[i]t limits the persons *with whom* the employer can do business."  *District No. 9, Int'l Ass'n of Machinists*, 134 N.L.R.B. 1354, 1358 (1961) (emphasis in original), *enforced*, 315 F.2d 33 (D.C. Cir. 1962).

> It is well established that contract clauses which purport to limit subcontracting to employers who are signatories to union contracts, so-called union signatory clauses, are proscribed by Section 8(e).  Such clauses are viewed as not being designed to protect the wages and job opportunities of unit employees covered by the contract, but are directed at furthering general union objectives and undertaking to regulate the labor policies of other employers.

*Verdugo Hills Bowl*, 237 N.L.R.B. 1204, 1206 (1978), *enforced*, 623 F.2d 61 (9th Cir. 1980) (citations omitted).  Such limits on subcontracting are proscribed by Section 8(e) as unlawful attempts to further union objectives outside of the unit.

In determining whether a restriction on subcontracting is unlawful, the critical inquiry is:

---

[5] Section 8(e), commonly referred to as the "hot cargo" provision, provides in pertinent part:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void . . . .

> whether . . . the Union's objective was preservation of work
> for [bargaining unit] employees, or whether the agreements
> and boycott were tactically calculated to satisfy union
> objectives elsewhere . . . The touchstone is whether the
> agreement or its maintenance is addressed to the labor
> relations of the contracting employer vis-à-vis his own
> employees.

*Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644-45 (1967); *see also NLRB v. Cent. Penn. Reg'l Counsel of Carpenters*, 352 F.3d 831, 834 (3d Cir. 2003).[6]

Subcontracting restrictions are lawful only if they are tailored narrowly to preserve bargaining unit work. *Bakery Wagon Drivers & Salesman v. NLRB*, 321 F.2d 353, 357 (D.C. Cir. 1963); *Cardinal Industries, Inc.*, 136 N.L.R.B. 977 (1962). A clause that prohibits all subcontracting of bargaining unit work is a lawful work preservation clause. *Greater St. Louis Auto. Trimmers & Upholsterers Ass'n, Inc.*, 134 N.L.R.B. 1354, 1358 (1961), *enforced*, 315 F.2d 33 (D.C. Cir. 1962). Also lawful is a clause that is limited to requiring that subcontractors observe the economic provisions of an agreement. *See Stark Elec., Inc.*, 262 N.L.R.B. 672, 674 (1982); *Dimeo Construction*, 180 N.L.R.B. 420, 421 (1969).

Subcontracting clauses that seek to prevent an employer from doing business with persons who are not signatories to a union agreement, by definition are "calculated to satisfy union objectives elsewhere." *See Spectacor Mgmt. Group*, 335 N.L.R.B. 586, 589 (2001), *enforced*, 320 F.3d 385 (3d Cir. 2003). The Board consistently has held that such union signatory agreements have a secondary, rather than primary, work preservation objective, and are unlawful under Section 8(e). See *id*. *See also Wilson & Co., Inc.*, 143 N.L.R.B. 1221 (1963), *enforced in relevant part*, 335 F.2d 709 (D.C. Cir. 1964); *Spectacor Mgmt. Group v. NLRB*, 320 F.3d 385 (3d Cir. 2003).

---

[6] Section 8(b)(4)(ii)(A) of the NLRA, 29 U.S.C. § 8(b)(4)(ii)(A), makes it unlawful for a union to threaten, coerce, or restrain an employer with an object of forcing the employer to agree to clauses that violate Section 8(e).

III.   **DISCUSSION**

   A.   **Article XXIII Of The SEIU-BOMA Agreement Is An Unlawful Union Signatory Clause**

   1.   **The Subcontracting Clause cannot have a Work Preservation because Contract Security Guards do not perform any BOMA bargaining unit work**

Article XXIII is not a lawful work preservation clause because it does not preserve any SEIU bargaining unit work. To have a lawful work preservation claim, the work at issue must be "fairly claimable" and "traditionally or customarily performed by the unit employees." *Conduit Fabricators*, 251 N.L.R.B. 794, 795 (1980). The crucial and determinative legal point is that BOMA members do not have security guards working to provide security at the apartment and office buildings in Chicago. It is not enough, however, that the employees could perform the work the agreement is seeking to preserve – the employees must have substantially performed the specific work for the specific employer. *See Conduit Fabricators, Inc.*, 225 N.L.R.B. 1364, 1365 (1976), *remanded for clarification*, 598 F.2d 216 (D.C. Cir. 1979), *reaff'd*, 251 N.L.R.B. 794 (1980); *see also Ernest Alessio Constr. Co., Inc.*, 310 N.L.R.B. No. 172 (1993); *Food Employers Council, Inc.*, 218 N.L.R.B. 680 (1975); *Local 282, Teamsters*, 197 N.L.R.B. 673 (1972).

Because most, if not all, BOMA members do not employ security guards, the SEIU-BOMA Agreement's restrictions on subcontracting cannot have a lawful work preservation objective. *See Nevins Realty*, 313 N.L.R.B. 392 (1993), *enforced in relevant part*, 68 F.3d 490 (D.C. Cir. 1995). In *Nevins Realty*, the Board reviewed a similar attempt by an SEIU local union to contractually restrict subcontracting. In that case, the union acknowledged that its members had never performed the work at issue, but argued that it sought to preserve work of the type that its members did generally. *Id.* at 400. The Board rejected the SEIU's work preservation defense and found that the agreement's subcontracting clause violated Section 8(e). *Id.*

As in *Nevins Realty*, the SEIU-BOMA Agreement unlawfully restricts subcontracting by BOMA members who never have performed the work the union seeks to preserve. Even if a few BOMA members employ security guards, the application of the clause beyond those members is sufficient to establish the unlawfulness of the clause. *See H.E.R.E Int'l Union, Local 274, AFL-CIO*, 326 N.L.R.B. 1058 (1998) (union signatory agreement violated Section 8(e), "notwithstanding that in part it tend[ed] to protect bargaining work."); *see also Helmkamp Construction Co.*, 271 N.L.R.B. 148, 152 (1984) (strike to force an employer to cease doing business with

independent contractors, even where there was a work preservation purpose, violated Section 8(b)(4)).[7]

> ## 2.    The language of Article XXIII, on its face, is an unlawful union signatory clause.

Even assuming any work existed that could be preserved, the subcontracting clause in Article XXIII of the SEIU-BOMA Agreement is not a lawful work preservation clause. Indeed, it is difficult to imagine any clearer violation of Section 8(e).

The written admissions of the parties to the SEIU-BOMA Agreement are conclusive evidence that the subcontracting clause violates Section 8(e). The June 3, 2004 memorandum sent by Ron Vukas to BOMA members leaves no room for doubt regarding the illegality of Article XXIII.:

> Please note that the BOMA/Chicago—SEIU Local 1 Security Agreement should be followed in **all** BOMA buildings that are signatory to the Security Agreement. If your building uses a contractor to employ security personnel, the contractor's obligation to follow this collective bargaining agreement should be incorporated into the agreement with the contractor. Please ensure that the contractor understands this fact and receives a copy of this agreement to follow.

*See* Exhibit 1 (emphasis in original). Mona Ballenger articulated the SEIU's agreement with this unlawful application of the agreement in her June 8, 2004 letter to Joe Krol to which she attached Mr. Vukas' memorandum. *See* Exhibit 3.

---

[7] In addition, a work preservation argument is unavailing to the SEIU because Section 9(b)(3) prevents a mixed union from claiming security guard work. In *Wells Fargo Armored Serv. Corp.*, 270 N.L.R.B. 787, 787 (1984), *enforced*, *Truck Drivers Local Union No. 807 v. NLRB*, 755 F.2d 5, 10 (2d Cir. 1985), the Board held that issuing a bargaining order would be the equivalent of certifying a mixed guard union, which is "inconsistent with congressional intent as manifested by Section 9(b)(3) of the statute." *Id.* 787-88. *but see General Service Employees Union, Local No. 73 v. NLRB*, 230 F.3d 909, 914-16 (7th Cir. 2000), *rev'g sub nom*, *Temple Security, Inc.*, 328 N.L.R.B. 663, 665 (1999). If the Board cannot issue a bargaining order to compel an employer to deal with a mixed union, then such a union lacks the continuing interest in work necessary for a work preservation claim.

Not surprisingly, the language of the SEIU-BOMA Agreement is consistent with this unlawful application. The subcontracting clause unlawfully requires that subcontractors "meet all the standards" of the SEIU-BOMA Agreement standing alone would constitute a violation of Section 8(e). In *Oregon-Columbia Chapter, The Associated General Contractors of America, Inc.*, the Board found that language requiring compliance with "all the provisions" of an agreement violated section 8(e). 243 N.L.R.B. 416, 420 (1979). Thus, the "all standards" language, standing alone, is sufficient to establish a Section 8(e) violation.

The language in Article XXIII applicable to work performed in BOMA buildings by subcontractors that have their own agreement with the SEIU further underscores the illegality. That language provides that "the terms and conditions of [the SEIU-BOMA Agreement] *shall be the only terms and conditions applicable to said contractor . . . .*" Such "terms and conditions" language also is on its face unlawful. *See RWKS Comstock*, 344 N.L.R.B. No. 90, *1 (2004) (clause requiring subcontractors to comply with "all of the terms and conditions of this Agreement" found unlawful); *see also Bldg. & Constr. Trades Council v. NLRB*, 328 F.2d 540 (D.C. Cir. 1964), (clause unlawful where it required compliance with "terms of the appropriate labor agreement"), *enforcing in relevant part,* 139 N.L.R.B. 236 (1962); *Dimeo Constr.,* 180 N.L.R.B. 420 (1969) (clause unlawful where it required compliance with "terms of this Agreement").

That Article XXIII illegally imposes the SEIU-BOMA Agreement on subcontractors also is made clear by the language of the subcontractor agreements Article XXIII displaces. For example, Wackenhut's agreement expressly states that:

> If there is any conflict between the BOMA/SEIU Local 1 Security Collective Bargaining Agreement and this Agreement in BOMA Security Signatory Buildings, the parties to this Agreement agree that the BOMA/SEIU Local 1 Security Collective Bargaining Agreement shall govern and agree to be bound by the terms and conditions of the BOMA/SEIU Local 1 Security Collective Bargaining Agreement.

*See* Exhibit 2. Once again, the language leaves no room to doubt that Article XXIII unlawfully imposes the SEIU-BOMA Agreement on subcontractors.

The application of the SEIU-BOMA Agreement's grievance and arbitration provision to contractors establishes that Article XXIII is in fact applied unlawfully. As Mr. Vukas explained in his June 3 memorandum, subcontractor grievances would be processed under the SEIU-BOMA Agreement. *See* Exhibit 1. The BOMA Labor

Joseph A. Barker
October 4, 2006
Page 14 of 17

Relations Manual and correspondence from the SEIU reiterate that subcontractors must comply with the SEIU-BOMA Agreement's grievance and arbitration clause. *See* Exhibits 5, 11, and 13. In his August 6, 2004 e-mail to contractors, Mr. Vukas explained that this procedure was negotiated by BOMA and the SEIU to expressly exclude subcontractors from having any influence on the interpretation of the agreement. *See* Exhibit 7. This application of a grievance and arbitration clause to subcontractors demonstrates that Article XXIII violates Section 8(e). *Dimeo Construction*, 180 N.L.R.B. at 421.

The requirement in BOMA requests for proposals for security services also makes clear that the subcontracting clause requires far more than compliance with economic standards. Consistent with Ron Vukas' June 3 memorandum, those requests for proposals specifically state that the contractor must employ SEIU members and contribute to the SEIU's benefit funds, etc. See Exhibit 13.

In short, the parties' written admissions, the plain language of the agreements, and the parties practices all establish that the purpose of Article XXIII is to impose an SEIU agreement on all BOMA subcontractors. As such, Article XXIII violates Section 8(e).

**B.    The SEIU has "entered into" the Unlawful Union Signatory Clause Within Six Months of Wackenhut's Filing of its Charge with the Board**

While the SEIU-BOMA Agreement was executed in 2004, a challenge to the 8(e) clause remains timely because the SEIU, BOMA, and individual BOMA members repeatedly and frequently have reaffirmed their agreement within the Section 10(b) limitations period, 29 U.S.C. § 160(b). In the context of agreements that violate Section 8(e), the Board has interpreted the words "to enter into" broadly to encompass the concepts of reaffirmation, maintenance, or giving effect to any agreement which is within the scope of section 8(e). *Furriers Joint Council of New York, United Food & Commercial Workers International Union*, 261 N.L.R.B 701, 704 (1982). As the Board has held, 'the words 'to enter into' must be interpreted broadly and encompass the concepts of reaffirmation, maintenance, or giving effect to any agreement which is within the scope of Section 8(e).'" *NLRB v. Central Pennsylvania Regional Counsel of Carpenters*, 352 F.3d 831 (3d Cir. 2003) (citations omitted).

Joseph A. Barker
October 4, 2006
Page 15 of 17

One of the clearest reaffirmations of the agreement is the issuance of the BOMA Labor Relations Seminar. The Labor Relations Manual unequivocally reaffirms the unlawful subcontracting clause in writing. Following the seminar, BOMA representative Marcia Rubinstein informed Wackenhut's Rich Flies that the SEIU-BOMA Agreement applied to Wackenhut employees working in BOMA buildings. These acts constitute a reaffirmation of the agreement within the 10(b) period.

In addition, BOMA and the SEIU have reaffirmed the unlawful subcontracting provisions within the 10(b) period. Consistent with the direction in the BOMA Labor Relations Manual, request for proposals issued by BOMA members to security guard contractors in the past six months expressly incorporate an obligation to deal with the SEIU.

RFPs for security guard contractors contain such language because BOMA and the SEIU require them to do so. For decades, BOMA and the SEIU have conspired to insure that RFPs would include precisely this language. In this respect, Ron Vukas's June 3 memorandum instructing BOMA members to instructing them to insure that they impose the BOMA-SEIU Agreement on guard contractors merely reaffirmed a long standing and continuing illegal practice. *See* Exhibit 1. Mona Ballenger's subsequent redistribution of Mr. Vukas's memorandum to security guard contractors, including Wackenhut, confirmed the SEIU's complicity in the illegal conduct. *See* Exhibit 3. Consequently, each issuance of an RFP in accordance with the unlawful instructions of BOMA and the SEIU constitutes a reaffirmation of the illegal subcontracting clause by these parties.

Moreover, it is far to late in the day for the SEIU to feign ignorance of the unlawful practices. Despite its knowledge of the contents of the Labor Relations Manual and BOMA's statements regarding the unlawful application of the subcontracting clause, the SEIU at no time has objected to any unlawful activity. The SEIU's failure to repudiate this illegal conduct itself constitutes a reaffirmation of the unlawful clause by the SEIU because the SEIU has an affirmative obligation to prevent the illegal application of its own subcontracting clause. *See, e.g., Ramey Constr. Co. v. Painters Local 544*, 472 F.2d 1127, 1131 (5th Cir. 1973) (unions must conduct picketing "in a manner least likely to encourage secondary effects); *accord Abreen Corp. v. Laborers' Intern. Union*, 709 F.2d 748, 755 (1st Cir. 1983) (unions have an obligation to "picket with restraint"), *cert. denied*, 464 U.S. 1040 (1984); *Carpenters Local 470 v. NLRB*, 564 F.2d 1360, 1363 (9th Cir. 1977); *Local 98, United Ass'n of Journeymen v. NLRB*, 497 F.2d 60, 65 (6th Cir. 1974).

That the SEIU is complicit in this unlawful pattern of conduct is underscored by the SEIU's reservation to itself of the right to demand the termination of any contractor that refuses to comply with the SEIU-BOMA Agreement. *See* Exhibit 11. That threat was reiterated in the BOMA Labor Relations Manual and the SEIU's retention of that authority is a reaffirmation by the SEIU of the illegal subcontracting restriction. *See, e.g., Furriers Joint Council of New York, United Food & Commercial Workers International Union*, 261 N.L.R.B. 701 (1982) (union reminded association that employer-members must not do business with persons not having a relationship with the union); *Federacion de Musicos de Puerto Rico, Local 469, American Federation of Musicians*, 246 N.L.R.B. 782 (1979) (union entered into unlawful clause when it notified the hotel of need to comply with the provision).

Finally, the entire course of the SEIU's conduct and the resulting nature of the Chicago market for contracted security services demonstrate that the SEIU reaffirms the agreement frequently and regularly. It simply is not possible that in a market without any unlawful restraints that the only successful contractors would be those represented by the SEIU. *Cf. City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548, 570-73 (6th Cir. 1999) (evidence of very high incumbency rates (i.e.,rate of contract renewal with existing customers) suggested unlawful conduct by defendants). Rather, the perfect correlation between an SEIU agreement and the ability to work in a BOMA building is powerful circumstantial evidence of ongoing illegal activity. *See Int'l Bhd. of Boilermakers, Local Union No. 154*, 253 N.L.R.B. 747 (1980) (statistical analyses evidence strengthened inference that union discriminated against nonmembers), *enforced*, 676 F.2d 686 (3d Cir. 1982); *Iron Workers District Council of the Pacific Northwest v. NLRB*, 913 F.2d 1470 (9th Cir. 1990) (failure of neutral subcontractors to appear for work supported inference that unions object was secondary), *enforcing* 292 N.L.R.B. 562 (1989); *see, e.g., Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998) (faulting Board for failing to credit probative circumstantial evidence.

## VI.     CONCLUSION

For the reasons set forth, the above-referenced charge has been shown to be meritorious, and a complaint should issue.

Respectfully submitted,

STROBL & SHARP, P.C.

By: _____
Dennis M. Devaney
Attorney for The Wackenhut Corporation
300 E. Long Lake Road, Suite 200
Bloomfield Hills, MI  48304
(248) 540-2300
Fax:  (248) 645-2690
Email:  ddevaney@stroblpc.com



ATTORNEYS & COUNSELORS

300 East Long Lake Road   Suite 200
Bloomfield Hills   Michigan   48304-2376

t  248 540 2300
f  248 645 2690
www.stroblpc.com

Dennis M. Devaney, Esq.
Direct Dial: 248-205-2766
Email: ddevaney@stroblpc.com

December 26, 2006

Joseph A. Barker, Regional Director
National Labor Relations Board - Region 13
The Rookery Building
209 South LaSalle Street, Suite 900
Chicago, IL 60604

Re:   Wackenhut's Section 8(e) Charge against SEIU Local 1 and
      BOMA/Chicago

Dear Mr. Barker:

Thank you for providing me the opportunity to respond to questions raised by the Division of Advice with respect to the 8(e) charge filed by me on behalf of my client, The Wackenhut Corporation, on October 4, 2006.

In the factual circumstances which we have presented to the Region, and because our charge directly alleges that the SEIU Local 1-BOMA/Chicago contract includes facially unlawful union signatory language, inquiry with respect to harm or damage of some kind to Wackenhut is irrelevant to the legal sufficiency of the charge. In our view, an inquiry with respect to "damages" to Wackenhut is a red herring and will slow down completion of the investigation and issuance of complaint. The harm that the statute addresses is clearly spelled out in the statutory language. The statute prohibits union signatory/cease doing business clauses as a matter of law.

As I mentioned to Barry Kearney in our discussions when I was in Washington, and as we discussed by telephone, the protected interests that are at issue go directly to limitations on employee freedom of choice which are created in rigged markets.  In Chicago, only signatories to the SEIU Local 1-BOMA/Chicago security agreement are able to effectively compete to provide contract security guard services in the downtown market.



ATTORNEYS & COUNSELORS

Joseph A. Barker
December 26, 2006
Page 2 of 2

Context is also very important in evaluating this charge. As you know, in 2001, SEIU approached Wackenhut when the downtown agreement was nearing expiration and demanded that Wackenhut recognize SEIU through a card check and neutrality agreement in twenty five (25) other cities as a condition of continuing the relationship in the downtown Chicago agreement. Wackenhut rejected SEIU's demand. As a result, Wackenhut was dropped from the downtown Chicago agreement by SEIU. In addition, the Chicago dispute between Wackenhut and SEIU was a principal genesis, along with a labor conflict in San Francisco, for the corporate campaign which SEIU has been waging on and off against Wackenhut since that time.

As I mentioned, although Wackenhut and its parent company, G4S, together compose one of the two largest security services firms in the world, Wackenhut has never been a major player in the Chicago market. We believe that this situation is not happenstance but results, in substantial part, because of the application of the unlawful union signatory clause. In 2004, Wackenhut was forced to resign the SEIU Local 1-BOMA/Chicago agreement in order to protect its competitive interests in the Chicago market. There is no question that a labor economic analysis of the Chicago market would show that Wackenhut and security guard service companies which are not signatories suffer competitive harm. Such a labor economic report would require the retention of an expert and a considerable period of time to complete the analysis.

As we discussed, prior to your appointment as Regional Director in Chicago, Wackenhut filed an 8(b)4 charge against SEIU and the Region went to complaint. A settlement with the SEIU was implemented by the Region. Per our conversation last week, I wanted to provide these preliminary comments to you today. I will follow-up with a more detailed points and authorities memorandum, which I should be able to get to you by Friday.

I appreciate this opportunity to preliminarily comment on the question raised by the Division of Advice.

Very truly yours,

Dennis M. Devaney

DMD:jlh
J:\DOCS\77010\017\ltr\SB190478.DOC

cc:     Barry J. Kearney, Esq.

**STROBL & SHARP**
PROFESSIONAL CORPORATION

300 East Long Lake Road  Suite 200
Bloomfield Hills  Michigan  48304-2376

t  248 540 2300
f  248 645 2690
www.stroblpc.com

Dennis M. Devaney, Esq.
Direct Dial:  248-205-2766
Email: ddevaney@stroblpc.com

December 29, 2006

Joseph A. Barker, Regional Director
National Labor Relations Board - Region 13
The Rookery Building
209 South LaSalle Street, Suite 900
Chicago, IL 60604

**Re:    Wackenhut's Section 8(e) Charge Against SEIU Local 1 and BOMA/Chicago**

Dear Mr. Barker:

The Wackenhut Corporation (Wackenhut) submits this memorandum of points and authorities to further address the Division of Advice's request for supporting evidence that Wackenhut has been damaged by the illegal Section 8(e) clause in the collective bargaining agreement between the Chicago Building Owners and Managers Association (BOMA/Chicago) and Local 1 of the Service Employees International Union (SEIU Local 1).

As I indicated in my preliminary response on December 26, 2006, while it is not possible to provide a detailed economic analysis quantifying damages in the short time provided, Wackenhut demonstrates by the points and authorities below how the illegal 8(e) clause necessarily harms Wackenhut.  Not only is Wackenhut suffering direct harm by being forced to turn over control of its labor costs to its customers, but it also is being foreclosed from certain markets as the SEIU is beginning to employ these illegal practices in other areas of the country.

Further, the request for proof of damages to Wackenhut is curious, as damages to the employer is not an element of a Section 8(e) violation nor is it a relevant inquiry under the National Labor Relations Act (NLRA).[1]  As discussed below, the NLRA protects employee rights.  As a result, it prohibits conduct by unions and employers that interfere with protected employee rights.  The unfair labor practices listed in Section 8 of the Act identify specifically the conduct that interferes with employee rights.  Thus, where an employer or union maintains a union signatory clause that violates Section 8(e) of the Act, 29 U.S.C. §158(e), the existence of the agreement, without more, conclusively establishes the interference with employee rights.

---

[1] While the issue may be relevant to a Section 10(l), 29 U.S.C. § 160(l), injunction proceeding, it is Wackenhut's understanding that the Division of Advice's inquiry, at this time, was not made for the purpose of pursuing injunctive relief.



That the BOMA/Chicago-SEIU Local 1 Agreement contains an unlawful union signatory clause is beyond dispute. Wackenhut already has presented the Region with overwhelming evidence, including admissions of BOMA and SEIU representatives, of the unlawful union signatory objectives of the BOMA/Chicago-SEIU Local 1 Agreement's subcontracting clause. While certainly not the only evidence, the following written statement of Ron Vukas (previously provided to the Region and to Advice), makes the illegal purpose of the clause abundantly clear:

> Please note that the BOMA/Chicago—SEIU Local 1 Security Agreement should be followed in all BOMA buildings that are signatory to the Security Agreement. <u>If your building uses a contractor to employ security personnel, the contractor's obligation to follow this collective bargaining agreement should be incorporated into the agreement with the contractor. Please ensure that the contractor understands this fact and receives a copy of this agreement to follow.</u>

*See* Statement of Position Dated October 4, 2006, Exhibit 1 (emphasis in original).

I.    Discussion

    A.    Wackenhut Has Been Damaged By The Maintenance Of The Unlawful Union Signatory Clause

While, as indicated, Wackenhut cannot produce the necessary detailed economic data in the short time allotted for this position statement, it has suffered direct economic damage from the maintenance of the union signatory clause at issue.[2] Wackenhut's damages are evident from the language of the NLRA, anecdotal evidence, and individual instances of enforcement of the SEIU Local 1-BOMA/Chicago Agreement.

The NLRA itself demonstrates a Congressional determination that damages will result from a failure to comply with the Act. Section 151 of the Act expressly states that:

> Experience has further demonstrated that certain practices by some labor organizations, their officers, and members have the intent or the necessary effect of burdening or obstructing commerce by preventing the free flow of goods in such commerce through strikes and other forms of industrial unrest or through concerted activities which impair the interest of the public in the free flow of

---

[2] Should the Division of Advice's continue to request additional proof of damages, Wackenhut requests that adequate time to produce the necessary economic analysis be provided.



such commerce. The elimination of such practices is a necessary
condition to the assurance of the rights herein guaranteed."

29 U.S.C. § 151. The unfair labor practice prohibitions in the Act are part of a statutory scheme
designed to prevent such damages. It necessarily follows that, even if not quantifiable,
Wackenhut (and other employers) is harmed by a violation of the Act.

Wackenhut is further harmed because the unlawful union signatory clause at issue here
deprives it of its Section 9(b)(3) right to insure the loyalty of its security officers. In *NLRB v.
Jones & Laughlin Steel Corp.*, 53 N.L.R.B. 1046 (1943), the Board rejected the Employer's
argument that the bargaining unit was inappropriate because it included plant guards. *Id.* at *13.
On review, the Supreme Court agreed, holding that the guards were employees under the Act and
entitled to selection of a bargaining agent representing non-guard employees. *NLRB v. Jones &
Laughlin Steel Corp.*, 331 U.S. 416, 431 (1947). Congress reacted quickly to the Supreme
Court's decision, enacting section 9(b)(3) to prohibit the Board from certifying unions that
admitted both guard and non-guard employees to membership (*i.e.,* a mixed union) as the
representative of a bargaining unit of guards. 29 U.S.C. § 159(b)(3).

The reason for Congress's quick reaction to *Jones & Laughlin Steel Corp.* was a
recognition that representation of guards by a mixed union raises serious loyalty concerns.
Conference Report No. 510 on H.R. 3020, 80th Cong., 1st Sess. 48 (1947). The unlawful union
security clause at issue in this case makes it impossible for Wackenhut to address these loyalty
concerns as it deems best for its business. Rather, the illegal clause gives Wackenhut only two
bad options – either accept the negative impact of a mixed union on its business or cease doing
business in the market. Given the fact that Congress already has spoken as to the damage caused
by a mixed union, the only inference to be drawn is that Wackenhut is damaged by either option.

Wackenhut is further damaged by the unlawful subcontracting clause because the clause
requires it to cede control of a significant part of its labor costs to its customers. Many of these
costs are not recoverable from its customers. For example, in its Statement of Position dated
October 11, 2006, Wackenhut submitted evidence that the SEIU was compelling it to arbitrate a
claim under the SEIU Local 1-BOMA/Chicago Agreement. (See Settlement Agreement of
Charles Johnson grievance accompanying the October 11, 2006 submission.) That agreement
provides that disputes will be resolved pursuant to Articles XVIII and XXIII of the SEIU Local
1-BOMA/Chicago Agreement. The Settlement Agreement does not reference the collective
bargaining agreement between Wackenhut and SEIU Local 1 at all, and cites as authority, only
the SEIU Local 1-BOMA/Chicago Agreement.



STROBL
&SHARP
PROFESSIONAL CORPORATION

Finally, Wackenhut is being harmed because the SEIU has begun imposing the same unlawful structure in other markets and with other customers. For example:

- On November 15, 2006 the SEIU announced that it had reached an agreement with downtown Los Angeles building owners to organize private security contractors. http://www.standforsecuritycoalition.com/news/061115labizJournal.html.

- In San Francisco, SEIU Local 24/7 has blatantly stated that Wackenhut is locked out of the market because it refuses to sign an agreement with the SEIU. *See* Exhibit 1 attached hereto.

- Although the agreements have not been made public, the SEIU recently announced an agreement with Simon Properties Group and Westfield Properties where those employers would effectively require their contractors to have an SEIU agreement. http://www.seiu.org/media/pressreleases.cfm?pr_id=1357

These are only a few of many examples of an accelerating trend of the SEIU to engage in top down organizing, which is accomplished through the vehicle of unlawful union signatory agreements.

B.    Under the NLRA, the NLRB May Not Refuse To Protect *Employee* Rights Because An *Employer* Is Not Damaged

The request for evidence of damages to Wackenhut is inappropriate because it ignores the public harm the Board is charged with protecting. Section 7 of the National Labor Relations Act ("NLRA" or "the Act") protects the rights of employees to organize or refrain from such organization. *See* 29 U.S.C. § 157. The Supreme Court long ago recognized that when adjudicating unfair labor practice cases, the Board's mandate is to protect public rights.

> The proceeding authorized to be taken by the Board under the National Labor Relations Act is not for the adjudication of private rights. It has few of the indicia of private litigation and makes no requirement for the presence in it of any private party other than the employer charged with an unfair labor practice. The Board acts in a public capacity to give effect to the declared public policy of the Act to eliminate and prevent obstructions to interstate commerce by encouraging collective bargaining and by protecting



the 'exercise by workers of full freedom of association, self-
organization, and designation of representatives of their own
choosing, for the purpose of negotiating the terms and conditions
of their employment * * *.'

*National Licorice Co. v. NLRB,* 309 U.S. 350, 364 (1940)[3]; *see also J.I. Case Co. v. N.L.R.B.,*
321 U.S. 332, 337 (1944) ("The Board asserts a public right vested in it as a public body, charged
in the public interest with the duty of preventing unfair labor practices.").

The Board itself has long recognized its duty to protect public rights. In *Hotel Holiday
Inn De Isla Verde,* the Board stated that it was "adher[ing] to the principle that in performing its
duty of preventing unfair labor practices, the Board acts in the public interest to enforce public,
not private, rights." 278 N.L.R.B. 1027, 1028 (1986) (citing *National Licorice Co. v. NLRB,* 309
U.S. 350 (1940)). Recently, the Board reaffirmed that "Congress established the Board to
administer and enforce the Act, and it has both the authority and the duty to make sure that
employee rights under the Act are protected." *Garden Ridge Mgmt., Inc.,* 2006 WL 1530147,
*34 (N.L.R.B. May 31, 2006). For this reason, the Board's rules and regulations provide that
"[a] charge that any person has engaged in or is engaging in any unfair labor practice affecting
commerce may be made by any person." 29 C.F.R. § 102.9.[4]

The request that Wackenhut produce evidence of damage simply is inconsistent with the
Act and the Board's public duty. The purpose of a charge before the Board is not, and cannot be,
to redress any harm to Wackenhut. Indeed, any requirement that a private litigant be damaged
for a complaint to issue would be completely and fundamentally at odds with the Board's duty
under the NLRA to protect employee rights.

Nor does the General Counsel have any discretion to refuse to issue a complaint based on
factors other than those relevant to the determination of whether an unfair labor practice has been
committed. Section 8 of the NLRA represents a Congressional determination that the listed
conduct interferes with employee rights. Consequently, the General Counsel would be ignoring
his statutory mandate if he refused to issue a complaint based on his own analysis of whether the
harm to employee rights was sufficiently significant. Congress has spoken through the Act
which reflects a determination that all unfair labor practices are, as a matter of law, significant.

The failure of the General Counsel to act in this case would be particularly egregious
because it also would violate a specific mandate of the NLRA. As demonstrated by Vukas's
quote above and the evidence in Wackenhut's previous position statements, no reasonable person

---

[3] *National Licorice* predated the Taft-Hartley Amendments to the Act, which added union unfair labor practices.
[4] As used in Board regulations, the term "person" has the same meaning as set forth in Section 2 of the NLRA. 29
C.F.R. § 102.1. Under the NLRA, "the term 'person' includes . . . corporations . . ." 29 U.S.C. § 152(1).



can doubt that the subcontracting clause of the SEIU Local 1-BOMA/Chicago Agreement violates Section 8(e). In such circumstance, Section 10(l) of the Act requires the General Counsel to obtain an injunction pending final adjudication of the matter before the Board. 29 U.S.C. § 160(l).

Indeed, on the facts presented in this case, a failure to issue a complaint would be the rare type of malfeasance warranting judicial intervention. While the General Counsel has broad discretion in deciding how to conduct an investigation, the General Counsel is not free to ignore the results of an investigation. See, e.g., *Illinois State Employees Council v. NLRB*, 395 F.Supp. 1011, 1012 (N.D. Ill. 1975); see also *BRAC v. Association for Benefit of Non-Contract Employees*, 380 U.S. 650, 661-2 (1965). Once the General Counsel's investigation makes the existence of a violation clear, the General Counsel's failure to act constitutes a "sacrifice or obliteration of a right which Congress had created" warranting the inference "that Congress intended the statutory provisions governing the general jurisdiction of those courts to control." *Leedom v. Kyne*, 358 U.S. 184, 190 (1958).

In *Russell v. NMB*, 714 F.2d 1332 (5th Cir. 1983), the Court considered an analogous improper exercise of discretion by the National Mediation Board (NMB). Relying on *Switchmen's Union v. NMB*, 320 U.S. 297 (1943), the District Court in that case held that:

> "[i]t is well established that [the Board's] decisions regarding representational disputes, made pursuant to Section 2, Ninth, of the Railway Labor Act, are not subject to judicial review."

714 F.2d at 1336. The Fifth Circuit reversed, holding that "where Congress has created a right, the Board cannot destroy that right without intervention by the judiciary." *Id.* at 1340; *see also Local 130, International Union of Electric, Radio & Machine Workers v. McCulloch,* 345 F.2d 90, 95 (D.C. Cir. 1965) (jurisdiction present where the Board's action is "so plainly beyond the bounds of the Act, or . . . so clearly in defiance of it, as to warrant the immediate intervention of an equity court . . .").

In sum, while the General Counsel's power is discretionary, it is not absolute. As *Russell* makes clear, the discretion to act is never a bar to judicial intervention where the discretion is used to destroy a right created by statute. In light of the unequivocal evidence, including the admissions of the charged parties, that the SEIU Local 1-BOMA/Chicago Agreement contains an unlawful union signatory clause, that is precisely what a failure to issue a complaint would accomplish.



## II.    CONCLUSION

In sum, even assuming evidence of damage to Wackenhut is necessary, sufficient evidence of damage exists for issuance of complaint.  In addition, a complaint should issue based on the evidence already submitted demonstrating a violation of Section 8(e) of the Act.

Respectfully submitted,

STROBL & SHARP, P.C.

By: _____
Dennis M. Devaney
Attorney for The Wackenhut Corporation
300 E. Long Lake Road, Suite 200
Bloomfield Hills, MI  48304
(248) 540-2300
Fax:  (248) 645-2690
Email:  ddevaney@stroblpc.com

cc:  Barry J. Kearney, Esq.



**EXHIBIT 1**



**Stronger Together**

Patrick Smith
Area Manager
The Wackenhut Corporation
100 Century Court
Suite 200
San Jose, CA 95112

*STEVE McCLENATHAN*
President

September 20, 2006

*ED PENA*
Secretary-Treasurer

Dear Patrick,

*TERESITA CRUZ*
Vice President

The purpose of this letter is to address the longstanding dispute between Wackenhut and SEIU, Local 247.

As you know, in 2003, Local 247 negotiated a new collective bargaining agreement that set a single standard for security officers in the Bay Area. This was a winner for everybody – it raised standards for security officers, it freed up security contractors to compete on quality instead of cost-cutting and it improved standards for clients. One of the clear indicators of the success of the agreement is demonstrated by the fact that the density of unionized security companies in the financial district of San Francisco has reached over 90%.

But Wackenhut is the exception to this success story. By failing to sign the SEIU Local 24/7 collective bargaining agreement, Wackenhut has shut itself out of one of the biggest security markets in the United States.

When you were at Barton, we had a very good relationship. You know the advantage of mutually respectful labor relations. I see no reason why we cannot do the same now that you are at Wackenhut. I understand that you probably have to consider the national picture, as I do, but if you are interested in exploring how we can work together, please contact me.

*SERVICE EMPLOYEES*
*INTERNATIONAL UNION*
AFL-CIO, CLC

Sincerely,

Eric Lerner,

Local 24/7 Staff Director

**Main Office:**
2201 Broadway, Suite 101
Oakland, CA 94612
510.625.9913
1.800.772.3326
Fax: 510.625.0998

# EXHIBIT 5



RECEIVED
MAR 7 2005
LABOR RELATIONS



March 2, 2005

Mr. Guy Wegener
Wackenhut Corp.
4200 Wackenhut Drive
#100
P.O. Box 109603
Palm Beach Gardens, FL 33410-4243

**THOMAS BALANOFF**
President

**CHRIS ANDERSEN**
Secretary-Treasurer

**VICE PRESIDENTS**
MARIA GRACIELA BARRERA
RODERICK S. BASHIR
AIRRINE M. CASTLE
NANCY E. CROSS
PETER J. HANRAHAN
DAN IVERSON
KAZIMIERZ LUPA
VINCE PESHA

PATRICIA ARROYO
Recording Secretary

SERVICE EMPLOYEES
INTERNATIONAL UNION
AFL-CIO, CLC

111 East Wacker Drive
Suite 2500
Chicago, IL 60601
312.240.1600
Fax: 312.233.8849

www.seiu1.org

**RE: SEIU Local 1 & Security Contractors 2004-2007 Downtown CBA**

Dear Mr. Wegener:

The above mentioned agreement covers downtown commercial office buildings within the area bounded by Roosevelt Road, Lake Michigan, North Avenue and Racine Avenue.

The BOMA/SEIU Local 1 Security Collective Bargaining Agreement supersedes the contractor agreement in those buildings which have BOMA Security signatory status.

Enclosed you will find a corrected page 1 of your signed security agreement with SEIU Local 1 which makes the above clear. Please sign the extra copy of this letter and return it to us to register your consent to this correction. Please replace this page in your original contract.

Please sign this letter and fax back to me at (312) 233-8845.

If you have any questions do not hesitate to contact me at (312) 233-8720.

Sincerely,

Mona Ballenger
Security Director

Cc: Ron Vukas, BOMA Chicago
    Jim McArdle, SEIU Local 25 Fund Manager
    Ken Cliff, Contract Administrator

Signed and so agreed this _____ day of March 2005.

By:_____

# EXHIBIT 6

Home   About Us

# ☆ Council on Competitiveness

Initiatives   Data Central   Newsroom   Video   Publications   Calendar

---

INNOVATEAMERICA.ORG

Enterpriseresilience.org

Regional Innovation

High Performance Computing

Global Initiatives

Benchmarking Competitiveness

World Class Workforce

Government Affairs

---

**Highlights**
Newsroom

**Tuesday, October 28, 2003**

Contact: Michael J. Meneer
Tel: (202) 969-3406
Fax: (202) 682-5150
Email: MMeneer@compete.org

## Council on Competitiveness Annual Meeting -- Challenges in Globalization: National Innovation and Security

**Security**

- *Launch of the National Innovation Initiative by Samuel J. Palmisano, Cha* *CEO of IBM*
- *Release of complete results of the national 2003 Competitiveness and Se* *Survey, a report by the Council on Competitiveness and Wilson Researcl*

**When:** Thursday October 30th, 2003; 7:30am to 3:30pm

**Where:** St. Regis Hotel, 16th and K Streets, NW, Washington, DC
*All sessions open to the media. Lighting and sound provided.*

The Council on Competitiveness Annual Meeting will feature the following three s

**Panel 1.--Strategies for Innovation: How Does a Nation Keep its Edge?**

To open this panel, IBM Corporation Chairman and CEO Samuel J. Palmisan
launch a new *National Innovation Initiative*–an effort over the coming year eng
Council Members with the White House, Governors, Members of Congress and c
stakeholders to develop a national innovation strategy. Mr. Palmisano will also ca
Council's *3rd National Innovation Summit* to discuss the findings and recomme
of an innovation strategy, and to forge a broad national consensus around the pa

The purpose of the National Innovation Initiative is threefold:

- Identify the key challenges and opportunities to strengthen innovation cap
- Develop strategic recommendations for the public and private sectors
- Create consensus among all elements of the national innovation enterpris
  companies, workers, universities and governments - on a vision and strat

Mr. Palmisano will discuss the initiative and its intended impact along with Natior
Innovation Initiative Co-Chair **Wayne Clough**, President, Georgia Institute of Tec
**Molly Broad**, President of the University of North Carolina; **John L. Hennessy**, I
Stanford University; **Patricia J Russo\***, Chairman and CEO of Lucent Technoloc
**W.J. Sanders III**, Founder and Chairman, Advanced Micro Devices

**Panel 2.--Global Networks and the Security Imperative**

The Networks and Security panel will address the progress that has been achiev
areas such as financial services, energy, and IT sectors over the past year and th
challenges that remain to be met in securing America economic infrastructure in
global networks.

**Charles M. Vest**, President of MIT, will start the panel discussion with an overvie
results of the **2003 Competitiveness and Security Survey**, a follow-up to last y
Council on Competitiveness survey. He will be joined on the panel by **Catherine**
CEO, BITS, Financial Services Roundtable; **Tom Balanoff**, President, Service E
International Union, Local 1; **Robert R. Bishop**, Chairman and CEO, Silicon Gra
Inc.; and **Robert M. Gates**, President, Texas A&M University.

Panel 3.--Accelerating the Global Economic Engine

The Global panel will examine the key factors needed to accelerate the global ec
engine, review some of the barriers to overcome and begin to identify policies an
that would support global economic growth while safeguarding US competitivene

**Raymond V Gilmartin**, Chairman and CEO of Merck & Co, Inc., will present an
on the issues. Ambassador **Thomas R. Pickering**, Senior Vice President, The B
Company will moderate the panel. He will be joined by **Morton Bahr**, President
Communications Workers of America; **Ray Stata**, Chairman, Analog Devices, Inc
**Lawrence Summers**, President, Harvard University.

In addition to these three panels, the 200 conferees will hear a luncheon keynote
from **Daniel Yergin**, Chairman, Cambridge Energy Research Associates.

* To be confirmed.

**For additional information, please contact:** Bill Booher, Council on Competitiv
(202-969-3385) bbooher@compete.org

Copyright © 2000 - 2007 Council on Competitiveness
Council on Competitiveness
1500 K Street, NW, Suite 850
Washington, DC 20005
(202) 682-4292
Fax: (202) 682-5150

# EXHIBIT 7

# AFFIDAVIT OF AARON WILLOUGHBY

AARON WILLOUGHBY deposes and says as follows:

1.  I am a professional process server employed by LaSalle Process Servers L.P., located in Chicago, Illinois. I was hired by The Wackenhut Corporation, through its attorneys, to serve a summons and complaint on Service Employees International Union ("SEIU"), Local 1, located at 111 E. Wacker Drive, Chicago, Illinois.

2.  I am not a party to the lawsuit between The Wackenhut Corporation and SEIU, Local 1, and I am over 18 years of age.

3.  On March 19, 2007, I appeared at 111 E. Wacker Drive to serve the summons and complaint on SEIU, Local 1. A woman by the name of Rosy Villa come to the lobby to meet me. She was dressed in a purple shirt bearing the SEIU logo. I told Ms. Villa that I was there to serve legal papers and she told me she was authorized to receive legal papers for the union.

4.  I filled out the Return of Service form on that day, describing that Rosy Villa accepted service and was authorized to accept service for SEIU, Local 1. I understand that the Return of Service was filed with the Court by the attorneys for The Wackenhut Corporation.

I declare, under penalty of perjury, that the foregoing is true and correct.

AARON WILLOUGHBY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE WACKENHUT CORPORATION,
4200 Wackenhut Drive
Palm Beach Gardens, FL  33410-4243

                    Plaintiff                  Case No. 07cv436 (RJL)

v.

                                     The Honorable Richard J. Leon

SEIU LOCAL 1,                        U.S. District Court Judge
111 E. Wacker Drive, Suite 2500
Chicago, IL  60601

                    Defendant

_____/

**ORDER DENYING DEFENDANT'S MOTION
TO QUASH SUMMONS AND DISMISS COMPLAINT**

      Upon consideration of Defendant's Motion to Quash Summons and Dismiss Complaint, Plaintiff's Opposition to Defendant's Motion, the pleadings filed with this Court, and after hearing oral argument from the parties on _____, this Court issues the following Order:

      IT IS HEREBY ORDERED that Defendant's Motion to Quash Summons and Dismiss Complaint is DENIED;

      IT IS FURTHER ORDERED that Plaintiff is permitted to take discovery, limited to the deposition of Defendant's President, Thomas Balanoff, for the purpose of developing additional information concerning this Court's personal jurisdiction over Defendant, SEIU Local 1.

Dated:_____                _____
                                    U.S. District Judge

J:\DOCS\77010\019\motbrf\SB201637.DOC